# United States Court of Appeals for the Federal Circuit

---

**FRANK P. SLATTERY, JR., (ON BEHALF OF HIMSELF AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED SHAREHOLDERS OF MERITOR SAVINGS BANK),**
*Plaintiff-Cross Appellant,*

AND

**STEVEN ROTH,**
AND **INTERSTATE PROPERTIES,**
*Plaintiffs-Cross Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2007-5063,-5064,-5089

---

Appeal from the United States Court of Federal Claims in Case No. 93-CV-280, Senior Judge Loren A. Smith.

---

Decided: January 28, 2011

---

THOMAS M. BUCHANAN, Winston & Strawn, LLP, of Washington, DC, argued for plaintiff-cross appellant Frank P. Slattery, Jr., (on behalf of himself and on behalf of all other similarly situated shareholders of Meritor

Savings Bank) on rehearing en banc. With him on the brief were PETER KRYN DYKEMA, ERIC W. BLOOM and JACOB R. LOSHIN.

BRADLEY P. SMITH, Sullivan & Cromwell LLP, of New York, New York, argued for plaintiffs-cross appellants Steven Roth and Interstate Properties on rehearing en banc. With him on the brief were RICHARD J. UROWSKY and JENNIFER L. MURRAY.

JEANNE E. DAVIDSON, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant on rehearing en banc. With her on the brief were MICHAEL F. HERTZ, Deputy Assistant Attorney General, KENNETH M. DINTZER, Assistant Director, F. JEFFERSON HUGHES and WILLIAM G. KANELLIS, Trial Attorneys.

DOROTHY ASHLEY DOHERTY, Federal Deposit Insurance Corporation, of Washington, DC, for amicus curiae Federal Deposit Insurance Corporation on rehearing en banc. With her on the brief was JOHN M. DORSEY III.

───────────────

Before RADER, *Chief Judge*, NEWMAN, LOURIE, BRYSON, GAJARSA, LINN, DYK, PROST, MOORE, and O'MALLEY, *Circuit Judges*, on rehearing *en banc*.

Opinion for the court filed by *Circuit Judge* NEWMAN, in which *Chief Judge* RADER and *Circuit Judges* LOURIE, BRYSON, LINN, and MOORE join. Dissenting opinion filed by *Circuit Judge* GAJARSA, in which *Circuit Judges* DYK, PROST, and O'MALLEY join.

NEWMAN, *Circuit Judge.*

This suit is brought on behalf of shareholders of the Meritor Savings Bank, formerly the Philadelphia Savings Fund Society. The cause originated in 1982, when the Western Savings Fund Society, a Pennsylvania bank, was failing, and the Federal Deposit Insurance Corporation (FDIC) sought a solvent bank to merge with Western, to provide new capital and to assume Western's liabilities; the merger would thereby avoid failure of Western and the accompanying draw on the FDIC insurance fund. The Philadelphia Savings Fund Society and the FDIC agreed to the merger, upon mutual undertakings and specifically including certain accounting procedures necessary to enable the merged bank to comply with statutory and regulatory capital requirements. The merger terms were embodied in several contracts, including a Merger Assistance Agreement and a Memorandum of Understanding. The events that culminated in the seizure and sale of Meritor in 1992 are set forth in the prior opinions of this court and the Court of Federal Claims.

The Court of Federal Claims found that the government had breached its contracts with the acquiring bank, and assessed damages. *Slattery v. United States*, 53 Fed. Cl. 258 (2002) (liability); *Slattery v. United States*, 69 Fed. Cl. 573 (2006) (damages); *Slattery v. United States*, 73 Fed. Cl. 527, *modified*, 2006 WL 3930812 (Dec. 18, 2006) (final order) (*Slattery I*). The appeal and cross-appeal were heard by a panel of the Federal Circuit, with decision reported at *Slattery v. United States*, 583 F.3d 800 (Fed. Cir. 2009) (*Slattery II*). The United States requested rehearing *en banc*, challenging the jurisdiction of the Court of Federal Claims and the Federal Circuit. We granted the petition in order to review the question of jurisdiction.

The government denies jurisdiction on several grounds. The principal ground for which rehearing was requested is that the Court of Federal Claims does not have jurisdiction of breach of contract claims when the federal entity that incurred the breach does not receive appropriated funds. Thus the government argues that this claim is not within the court's Tucker Act jurisdiction because the Federal Deposit Insurance Corporation is currently supported by fees from member banks, not by congressional appropriations, and there is no specific appropriation with respect to payment of this judgment. The government states that this court's precedent, including the precedent of our predecessor the Court of Claims,[1] establishes this exception to Tucker Act jurisdiction.

The Court of Federal Claims, receiving this argument, distinguished the FDIC from those government entities whose violation of statute or breach of contract had been deemed to be outside of Tucker Act jurisdiction. *Slattery I*, 53 Fed. Cl. at 270–74. On appeal, the Federal Circuit agreed that the Court of Federal Claims possessed jurisdiction. *Slattery II*, 583 F.3d at 807–12, 829–32. In view of the potential reach of this jurisdictional challenge, and perceived conflict in precedent, we granted the government's petition for rehearing *en banc*, vacated our decision in *Slattery II*, and requested additional briefing on the following questions:

(a) Is the Federal Deposit Insurance Corporation a nonappropriated fund instrumentality, and if so, what is the effect on the jurisdiction of

---

[1] In *South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc), the precedent of the Court of Claims was adopted by the Court of Appeals for the Federal Circuit. The Court of Federal Claims is the successor to the Trial Division of the Court of Claims.

the Court of Federal Claims over this suit against the United States?

(b) What is the appropriate standard for determining whether an entity is a nonappropriated fund instrumentality?

*Slattery v. United States*, 369 F. App'x 142 (Fed. Cir. 2010) (Order).  The Federal Deposit Insurance Corporation has participated in this rehearing as *amicus curiae* and has filed briefs and presented argument.

On review of the history and application of the Tucker Act, we confirm that the Court of Federal Claims has jurisdiction of this cause.  We conclude that the source of a government agency's funds, including funds to pay judgments incurred by agency actions, does not control whether there is jurisdiction of a claim within the subject matter assigned to the court by the Tucker Act.  The jurisdictional criterion is not how the government entity is funded or its obligations met, but whether the government entity was acting on behalf of the government.  We also confirm that a claim that is within the subject matter of the Tucker Act is not excluded from the jurisdiction of the Court of Federal Claims, or jurisdiction of the district courts under the "Little" Tucker Act, unless such jurisdiction has been unambiguously withdrawn or withheld by a statute specifying such exclusion.  Thus we confirm that Tucker Act jurisdiction does not depend on and is not limited by whether the government entity receives or draws upon appropriated funds.  Conflicting precedent shall no longer be relied upon.

# I

## HISTORY OF THE TUCKER ACT

The history of the Tucker Act is the history of judicial determination of claims against the United States and the procedures for payment of such claims.

Before 1855 claims against the federal government required direct petition to Congress. In 1855, to improve and expedite the treatment of claims, Congress created a Court of Claims to hear "any claim against the United States founded upon any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the government of the United States." Court of Claims Act, ch. 122, §1, 10 Stat. 612 (1855). This Act provided that the court would investigate each claim and report its findings and proposed decision to Congress; Congress would then review the court's proposal, and finally decide the claim. Any payment to the claimant was implemented by specific legislative enactment. For detailed exposition of this history see Wilson Cowen, Philip Nichols, Jr., and Marion T. Bennett, *The United States Court of Claims, A History, Part II* (1978), *reprinted in* 216 Ct. Cl. (1978), and authorities cited therein.

As the number of claims against the federal government increased, and with the increasing congressional burdens of the era, President Lincoln recommended that the Court of Claims be empowered to render final judgments, rather than only make recommendations to Congress. *See* Cong. Globe, 37th Cong., 2d Sess. app. 2 (1861) (President's annual message to Congress, stating: "It was intended by the organization of the Court of Claims mainly to remove this branch of business from the Halls of Congress; but while the court has proved to be an effective and valuable means of investigation, it in great

degree fails to effect the object of its creation, for want of power to make its judgments final."). President Lincoln's recommendation was implemented by the Amended Court of Claims Act of 1863, ch. 92, 12 Stat. 765 (1863), which authorized the Court of Claims to enter final judgments, *see* §§3, 5, 7, 12 Stat. at 765–66, and also to adjudicate government counterclaims and setoffs, *see* §3, 12 Stat. at 765. The statute included the right of appeal to the Supreme Court. *See* §5, 12 Stat. at 766; H.R. Rep. No. 37-34, at 3 (2d Sess. 1862) ("[The Court of Claims] judgments are made final in all such cases, subject to the right of appeal by either party to the Supreme Court on all questions of law, where the amounts exceed three thousand dollars.").

The 1863 Act provided that judgments of the Court of Claims would be paid from a general appropriation for that purpose:

> [I]n all cases of final judgments by said court, or an appeal by the said supreme court where the same shall be affirmed in favor of the claimant, the sum due thereby shall be paid out of any general appropriation made by law for the payment and satisfaction of private claims, on presentation to the Secretary of the Treasury of a copy of said judgment, certified by the clerk of said court of claims, and signed by the chief justice, or, in his absence, by the presiding judge, of said court.

§7, 12 Stat. at 766. This provision, now codified as amended at 28 U.S.C. §2517(a), removed the need for a special congressional appropriation to pay each individual judgment. *See* Floyd D. Shimomura, *The History of Claims Against the United States: The Evolution from a Legislative Toward a Judicial Model of Payment*, 45 La. L. Rev. 625, 652–53 (1985).

The Act of 1863 had initially also provided, in Section 14, that "no money shall be paid out of the Treasury for any claim passed upon by the Court of Claims until after an appropriation therefor shall be estimated for by the Secretary of the Treasury." §14, 12 Stat. at 768. Section 14 was repealed by Act of March 17, 1866, ch.19, §1, 14 Stat. 9, after the Supreme Court held in *Gordon v. United States*, 69 U.S. (2 Wall.) 561 (1864), that "under the Constitution, no appellate jurisdiction over the Court of Claims could be exercised by this court." The Court later explained that it was contrary to the Constitution to subject a judicial decision to "revision of a Secretary and Congress," *Gordon v. United States*, 117 U.S. 697, 703 (1886), citing *Hayburn's Case*, 2 U.S. (2 Dall. 409) 408 (1792), and *United States v. Ferreira*, 54 U.S. (13 How.) 40 (1851). *See generally* Cowen et al., *supra*, at 23–24 & nn.77–78.

The debate during enactment of the 1863 Act had focused on whether the Appropriations Clause prohibited Congress from delegating its authority to settle claims, and also on the provision whereby Congress would "appropriate in gross a sum to pay private claims." Cong. Globe, 37th Cong., 3d Sess. 416–17 (1863) (statement of Sen. Hale); *see also* Cong. Globe, 37th Cong., 2d Sess. 1671–73 (1862) (statement of Rep. Diven) (stating other objections). Senator Trumbull explained the general appropriation provision:

> The provision is that the judgments are to be paid out of any general appropriation which Congress may make for the purpose of paying them. Congress will still make the appropriation for the purpose of paying them as it does now; but the bill goes on the supposition that instead of taking up each case and making a specific appropriation to pay $10,000 to A B, and then in another bill an

> appropriation of $10,000 to C D, we shall have a general appropriation to pay the judgments rendered by the Court of Claims, and those judgments will be paid out of that general appropriation.

Cong. Globe, 37th Cong., 3d Sess. 304 (1863).  Senator Doolittle further explained that

> as the bill now stands, it provides and seems to anticipate that there shall be a general fund appropriated by Congress from year to year to pay the private claims that may be found due against the Government; and it provides that these claims are to be paid out of that general fund.

*Id.* at 398.

Following the 1863 enactment, Congress made periodic general appropriations for payment of the judgments of the Court of Claims, initially on an annualized basis, *e.g.*, Act of June 25, 1864, ch. 147, 13 Stat. 145, 148, and then by a standing appropriation that created a Judgment Fund to pay all Court of Claims judgments for which a specific appropriation did not exist, *e.g.*, Supplemental Appropriation Act, 1957, Pub. L. No. 84-814, §1302, 70 Stat. 678, 694–95 (1956).  *See generally* Shimomura, 45 La. L. Rev. at 660–61, 686–87.

In *Glidden Co. v. Zdanok*, 370 U.S. 530 (1962), the Supreme Court reviewed this history and explained how the general judgment fund implements the prompt payment of judgments against the United States: "A judgment creditor . . . simply files in the General Accounting Office a certificate of the judgment signed by the clerk and the chief judge of the Court of Claims, and is paid." *Id.* at 569.  The Court observed that the possibility that judgments against the government might not be funded

did not affect the court's judicial power, i*d.* at 570; the Court recognized that the funding of payment of judgments was unrelated to Tucker Act jurisdiction.

The Judgment Fund had been limited to payments up to $100,000, but Congress removed the cap, so that the Fund covers claims of any amount. Supplemental Appropriations Act, 1977, Pub. L. No. 95-26, ch. 14, 91 Stat. 61, 96–97. The Cowen *et al. History* explains that this "permanent and indefinite appropriation," S. Rep. No. 95-64, at 206 (1977), to fund judgments of the Court of Claims fulfilled the promise of the Act of 1863 by rendering the court's judgments final in every meaningful respect. Cowen *et al.*, *supra*, at 161–62.

These enactments concerning payment of judgments did not deal with the jurisdiction of the Court of Claims; the Judgment Fund was designed to facilitate the payment by the United States of its obligations, along with the grant of authority to the Court of Claims to render final judgments. There is no indication that this mode of payment of judgments of the Court of Claims affected the court's jurisdiction, or was intended for this purpose. However, some later decisions viewed as "jurisdictional" the source of funds to pay judgments arising from activities of federal entities, leading to the present jurisdictional challenge.

The next relevant legislative action after the Acts of 1863 and 1866 was the Act, introduced by Representative John Randolph Tucker of Virginia, that enlarged the jurisdiction of the Court of Claims to include not only the classes of claims set forth in the 1855 Court of Claims Act, but also "claims founded upon the Constitution of the United States." Act of March 3, 1887, ch. 359, 24 Stat. 505. Representative Bayne remarked that the statutory purpose was "to give the people of the United States what

every civilized nation of the world has already done—the right to go into the courts to seek redress against the Government for their grievances." 18 Cong. Rec. 2680 (Mar. 3, 1887).

Justice Holmes called the Tucker Act a "great act of justice." *United States v. Emery, Bird, Thayer Realty Co.*, 237 U.S. 28, 32 (1915). In *United States v. Mitchell*, 463 U.S. 206 (1983), the Court observed that "government liability in contract is viewed as perhaps 'the widest and most unequivocal waiver of federal immunity from suit,'" *id.* at 215 (quoting *Developments in the Law—Remedies Against the United States and Its Officials*, 70 Harv. L. Rev. 827, 876 (1957)), and that "the Act makes absolutely no distinction between claims founded upon contracts and claims founded upon other specified sources of law," *id.* at 216.

Tucker Act jurisdiction remained undiluted until several cases arose concerning claims against military post exchanges and other operations at military bases. In these cases the Court of Claims implemented the statutes and regulations that absolved the government of liability for claims against "nonappropriated fund instrumentalities" of the military services.

A.   The Nonappropriated Fund Instrumentality (NAFI)

The military post exchanges and other entities such as officers clubs are described in military statutes and regulations by the term "nonappropriated fund instrumentality." This term is defined as operations "for the comfort, pleasure, contentment, or physical or mental improvement of members of the Armed Forces," 10 U.S.C. §2488(f). *See* Paul J. Kovar, *Legal Aspects of Nonappropriated Fund Activities*, 1 Mil. L. Rev. 95, 95–103 (1958) (explaining military origin and usage of the term "nonap-

propriated fund instrumentality"). Among the statutes directed to these activities, 10 U.S.C. §4779(b) provides that "[n]o money appropriated for the support of the Army may be spent for post gardens or Army exchanges." The Court of Claims, applying the military provisions, held that claims arising from violation of law or contract by these instrumentalities could not be remedied by suit under the Tucker Act.

The status of the post exchanges came to the attention of the Supreme Court in *Standard Oil Co. of California v. Johnson*, 316 U.S. 481 (1942), on an issue of state taxation. The California courts had required Standard Oil to pay the state tax on gasoline sales to post exchanges, holding that the exchanges were not an instrumentality of the federal government because "an army post exchange 'is not instituted by the aid of funds from the United States nor are its avails paid into the treasury. . . . Neither the government nor the officers of the post wherein the exchange is located are liable for its debts.'" *Standard Oil Co. of Cal. v. Johnson*, 19 Cal. 2d 104, 107–08 (1941) (quoting *People v. Standard Oil Co.*, 218 Cal. 123, 128 (1933)), *rev'd*, 316 U.S. 481 (1942). In reversing, the Court held that the post exchanges "are arms of the government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the constitution and federal statutes." *Standard Oil*, 316 U.S. at 485. The Court stated this conclusion even as it observed that "the government assumes none of the financial obligations of the exchange." *Id.*

The Court's recognition of the government's disclaimer of liability for obligations of the post exchanges was cited by the Court of Claims in negating Tucker Act jurisdiction of claims for breach of contract by the ex-

changes. Thus in *Borden v. United States*, 116 F. Supp. 873 (Ct. Cl. 1953), the Court of Claims held that the United States could not be sued under the Tucker Act to redress a breached employment obligation with a civilian employee of a post exchange, citing *Standard Oil* and Army Regulation 210-65 ¶35(h)(1):

> ¶35(h)(1) Exchange contracts are solely the obligation of the exchange. They are not Government contracts and the distinction between exchange contracts and Government contracts will be observed and clearly indicated at all times.

116 F. Supp. at 877. The court mentioned the reliance of the Regulations on a theory of nonappropriated funds, and, citing several other decisions to the same effect, held that there was not Tucker Act jurisdiction of claims for breach of exchange contracts.

The Court of Claims recognized that these holdings had the effect of insulating contracts of the military exchanges from suit anywhere, for the exchanges had been held immune from suit in other federal courts and in state forums in light of *Standard Oil*'s ruling that they were government entities. The court suggested that "this situation should be called to the attention of the Congress. It seems fair that either the Post Exchanges or the Government should be subject to suit and liable for any breach of contract that had been duly signed by the Army Exchange Service." *Id.* at 878.

Citing *Borden* and *Standard Oil*, in *Pulaski Cab Co. v. United States*, 157 F. Supp. 955 (Ct. Cl. 1958), the Court of Claims denied Tucker Act jurisdiction of a claim for breach of a contract between the Fort Leonard Wood Exchange and taxicab operators. The court observed that the contract included the proviso required by the Army regulations, placing the Pulaski Cab Company on notice

that its contract was not with the government. The court held that "the United States has not consented to be sued upon a contract of this instrumentality which includes within its terms a specific declaration of governmental nonliability," and dismissed the suit for lack of jurisdiction. *Id.* at 958. Judge Whitaker wrote in concurrence that it was "abhorrent . . . for the sovereign to do a wrong and to refuse redress for it," but observed that in this case the contract itself stated that the government would not be liable. *Id.* (Whitaker, J., concurring).

The Court of Claims again denied Tucker Act jurisdiction in *Gradall v. United States*, 329 F.2d 960 (Ct. Cl. 1963), applying the military regulations to a claim that raised the question of whether post exchange employees were covered by the Economy Act of 1932. The court cited *Pulaski Cab* and Army and Air Force Regulations providing that "[t]he United States is not responsible for contract, tort and compensation claims against the Army and Air Force Exchange Systems and has not waived its immunity from suit on those claims. Any claim arising out of the activities of the A and AFES shall be payable solely from nonappropriated funds," *Gradall*, 329 F.2d at 963 (quoting AR-60-10, AFR 147-7A, Exchange Service, dated August 2, 1960, Section 1(7)).

Again in *Keetz v. United States*, 168 Ct. Cl. 205 (1964) (per curiam), the court referred to "the recurring question of the legal status of an employee of an Armed Forces Post Exchange." *Id.* at 206. The court held that since prior cases established that exchange employees are not employed by the United States, any violation of federal employment law by the exchanges is not subject to suit against the United States under the Tucker Act. *Id.* at 207.

These restrictions on access to Tucker Act redress for claims arising from actions of the military exchanges were widely perceived as unfair, for they deprived aggrieved persons of all legal recourse, in that the exchanges successfully invoked sovereign immunity to bar suit in the district courts and state courts. The inequity was magnified because the United States could and did bring suit on behalf of the exchanges, while an aggrieved contracting party had no remedy when the exchange was the breaching party. *E.g.*, *United States v. Howell*, 318 F.2d 162 (9th Cir. 1963) (suit by the United States against a cleaning concession for breach of a contract with a post exchange).[2]

Issues of nonappropriated funds continued to be raised with respect to Tucker Act jurisdiction of agency actions, and governmental challenges to jurisdiction began to appear in wider contexts. In *National State Bank of Newark v. United States*, 357 F.2d 704 (Ct. Cl. 1966), the Court of Claims rejected the government's challenge to jurisdiction of a claim based on contracts with the Federal Housing Authority (FHA). The FHA had been established under the National Housing Act of 1934 to provide a federal system of mortgage insurance and thereby "encourage improvement in housing standards and conditions." *Id.* at 708–09 & n.6. The government argued that there was not Tucker Act jurisdiction because the National Housing Act only allowed the FHA to issue debentures on mortgages assigned to it, but not to obligate Treasury funds, and also because Congress specifically authorized the FHA to "sue and be sued" in the district courts. *Id.* at 710. The Court of Claims held that because the FHA was "doing work of the government," its

---

[2]    By legislation in 1970 the Congress remedied this "inequitable 'loophole' in the Tucker Act," as it was described in *United States v. Hopkins*, 427 U.S. 123, 126 (1976). *See* Part II.A, *post*.

contracts were subject to the jurisdiction of the Tucker Act. *Id.* at 708 (quoting *Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 389 (1939)). The court stated that "[b]y using the FHA to carry out [the purposes of the National Housing Act], the United States submits itself to suit under the Tucker Act unless there is some specific provision to the contrary." *Id.* at 706–07.

In addressing the government's argument that "only the FHA Housing Insurance Fund is liable for insurance benefits, and that a judgment by [the Court of Claims] would assess the general revenues of the Treasury," the court explained that there was "nothing in the insurance benefits provisions to indicate any intention to extract from the Tucker Act's broad coverage claims based on the acts of the Housing Insurance Fund." *Id.* at 712. Responding to the argument that the congressional authorization to "sue and be sued" was a limited waiver of sovereign immunity only in the district courts, the Court of Claims held that the bank's claim for breach of contract was subject to Tucker Act jurisdiction independent of whether the FHA could be sued in the district courts. *Id.* at 710–11.

Soon after the *Bank of Newark* decision, the Court of Claims decided *Kyer v. United States*, 369 F.2d 714 (Ct. Cl. 1966). The Court of Claims had initially limited its denial of Tucker Act jurisdiction to activities whose authorizing statutes and regulations denied government responsibility, whereas the court had generally declined to apply the nonappropriated fund theory to negate jurisdiction in other areas of government activity, as illustrated in *Bank of Newark*. However, the court in *Kyer* applied the nonappropriated fund theory more broadly.

Mr. Kyer had a sales commission contract with the Grape Crush Administrative Committee of the Secretary

of Agriculture, whereby Mr. Kyer, as broker, would locate purchasers of industrial alcohol derived from surplus grapes. His suit for breach of contract was initially filed in state court and removed to federal district court, and was dismissed on the government's claim of sovereign immunity, the government stating that the Grape Crush Committee was an "integral part of the Department of Agriculture and of the United States," *id.* at 716. Mr. Kyer then brought suit in the Court of Claims, where the government argued that the government was not subject to suit because the Grape Crush Committee was a nonappropriated fund instrumentality. *Id.* at 717. The Court of Claims held that the contract was not subject to Tucker Act jurisdiction because Tucker Act claims are paid from the Judgment Fund, and the Grape Crush Committee was "neither supported by appropriations nor authorized, in any manner, to obligate such funds," *id.* The court stated:

> While the terms of [the Tucker Act] are broad, its words must be read in conjunction with and must be regarded as limited by another statute which provides that our judgments are paid only from appropriated funds. [footnote 15] Thus, to remain within the framework of our jurisdiction, it is essential that the contract sued on be one which could have been satisfied out of appropriated funds.
>
> > [footnote 15]: 28 U.S.C. §2517 (1964) states, in part: "(a) Every final judgment rendered by the Court of Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the General Accounting Office of a certification of the judgment by the clerk and chief judge of the court."

*Kyer*, 369 F.2d at 718 & n.15.

This description of the Judgment Fund as "limiting" Tucker Act jurisdiction came to be raised by the government whenever a government entity received support from a source other than congressional appropriation. In most cases Tucker Act jurisdiction was sustained, despite the entity's self-supporting activity or fee-based income, because the court found that Congress had not separated the agency from appropriated funds. Examples are the United States Postal Service as held in *Butz Engineering Corp. v. United States*, 499 F.2d 619 (Ct. Cl. 1974); the Saint Lawrence Seaway Development Corporation as held in *Breitbeck v. United States*, 500 F.2d 556 (Ct. Cl. 1974); the General Services Administration as held in *Convery v. United States*, 597 F.2d 727 (Ct. Cl. 1979); the Office of the Comptroller of the Currency as held in *L'Enfant Plaza Properties, Inc. v. United States*, 668 F.2d 1211 (Ct. Cl. 1982); and the Agency for International Development as held in *McCarthy v. United States*, 670 F.2d 996 (Ct. Cl. 1982).

Tucker Act jurisdiction was sustained when the agency had access to appropriated funds, even if such funds were not used. Examples include *DeMauro Construction Corp. v. United States*, 568 F.2d 1322, 1328–29 (Ct. Cl. 1978) (contract with Corps of Engineers for construction of a dam in Okinawa not excluded from Tucker Act jurisdiction in view of the Corps' access to appropriated funds in connection with the project), and *Norris Industries, Inc. v. United States*, 681 F.2d 751 (Ct. Cl. 1982) (Tucker Act jurisdiction applies in view of access to appropriated funds for sales under the Foreign Military Sales Act).[3]

---

[3] The Tucker Act is not available when the breaching entity is not part of the federal government or not

In each case the government had argued that because the government entity was not supported by appropriated funds it was excluded from Tucker Act jurisdiction. For example, in *Breitbeck* the issue arose in a pay claim by employees of the Saint Lawrence Seaway Development Corporation, a government entity that was intended to be self-sustaining and was authorized to charge user fees and issue revenue bonds. The Court of Claims rejected the government's argument that there was no Tucker Act jurisdiction because the Seaway was a nonappropriated fund instrumentality, and observed that the Seaway "is 'an agency selected by the Government to accomplish purely Governmental purposes,'" *Breitbeck*, 500 F.2d at 558 (quoting *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539 (1946)). The court remarked that "it would be anomalous to hold that suits for retirement pay

---

acting as its agent, or when jurisdiction has been explicitly disclaimed. Such situations are illustrated in *Chas. H. Tompkins Co. v. United States*, 230 Ct. Cl. 754, 756 (1982), the court explaining that the National Trust for Historic Preservation in the United States, a charitable nonprofit corporation, "is not a federal instrumentality and performs no [federal governmental] functions." In *Green v. United States*, 229 Ct. Cl. 812, 814 (1982), the court held that the United States could not be sued for actions of Amtrak because Congress expressly provided that "[t]he Corporation will not be an agency or establishment of the United States Government." In *Porter v. United States*, 496 F.2d 583, 587–91 (Ct. Cl. 1974), the court held that the Government of the Trust Territory of the Pacific Islands, established by the United States as trustee under an agreement with the United Nations, was neither part of the United States nor an agent authorized to bind the United States. The FDIC statute provides that entities such as "bridge depository institutions" chartered to assist the FDIC in dealing with insured institutions that are in default, are not agencies of the United States, *see* 12 U.S.C. §1821(n)(6)(A).

could be brought under the Tucker Act but that actions for regular pre-retirement pay could lie only against the Corporation itself." *Id.* at 559. The court distinguished *Kyer* on the ground that there was "no such clear cleavage between the Corporation's own funds and those of the United States that one can say that Congress wished to cut the agency entirely loose from appropriated funds." *Id.* The court also distinguished *Abbott v. United States*, 112 F.Supp. 801 (Ct. Cl. 1953), where the court held that it did not have jurisdiction to receive employee pay claims arising from operations of the Panama Canal Company. The *Abbott* court pointed out that Canal employees are not subject to the Federal Classification Act or the general pay schedule, and concluded that "Congress seems to have wanted to cut [the Canal] loose from the United States as far as possible." *Id.* at 804.

*Butz Engineering* concerned the newly independent United States Postal Service. The court held that there continued to be Tucker Act jurisdiction, observing that "Congress has shown it is capable of unequivocally cleaving a public service or corporation from all governmental nexus when it so desires." 499 F.2d at 624. The court cited the example of the Securities Investors Protection Corporation, whose legislation provided that it "'shall not be an agency or establishment of the United States Government,'" *id.* (citing 15 U.S.C. §78ccc(a)(1) (1970)); the court contrasted that legislation with the absence of such a provision with respect to the Postal Service.

The court in *Butz Engineering* again distinguished *Kyer*, and held that the *Kyer* Judgment Fund "limitation" on jurisdiction did not apply because the Postal Service Reorganization Act shows that "the United States was to continue responsible for USPS activities." *Id.* at 625. The court explained that a government entity can be legislatively required to pay its own judgments, or to reimburse

the Treasury for judgments paid, without affecting Tucker Act jurisdiction of the claim.  Such an arrangement was established for the Postal Service. *See* 39 U.S.C. §409(h) ("A judgment against the Government of the United States arising out of activities of the Postal Service shall be paid by the Postal Service out of any funds available to the Postal Service, subject to the restriction specified in section 2011(g).").

In some cases, including cases involving issues other than government contracts, the courts have held that there is Tucker Act jurisdiction of claims against the United States based on activities of a governmental entity, unless Congress specifically stated its intention to withdraw Tucker Act jurisdiction.  In the *Regional Rail Reorganization Act Cases*, 419 U.S. 102 (1974), the Supreme Court examined whether the Regional Railroad Reorganization Act of 1973 should be construed to bar action under the Tucker Act for a claim concerning the taking of property.  The district court had looked to whether the Rail Act "affirmatively provided the Tucker Act remedy," and, finding no such provision, concluded that there was not Tucker Act jurisdiction.  The Court held that the district court had made the wrong inquiry, and that:

> The question is not whether the Rail Act expresses an affirmative showing of congressional intent to permit recourse to a Tucker Act remedy. Rather, it is whether Congress has in the Rail Act withdrawn the Tucker Act grant of jurisdiction to the Court of Claims to hear a suit involving the Rail Act "founded . . . upon the Constitution."

*Id.* at 126.  The Court explained that although the Rail Act provisions were "said plainly to evince Congress' determination that no federal funds beyond those ex-

pressly committed by the Act were to be paid for the rail properties," *id.* at 127, the statute "suggests that Congress . . . gave no consideration to withdrawal of the Tucker Act remedy," *id.* at 129. The Court cited the canon that "repeals by implication are disfavored," *id.* at 133 (citing, *e.g.*, *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 565 (1963)), and held that a partial repeal of the Tucker Act could not be inferred.

The Court reiterated the requirement of an "unambiguous intention" of Congress to withdraw access to the Tucker Act, in reviewing jurisdiction of the constitutional claim in *Presault v. Interstate Commerce Commission*, 494 U.S. 1, 12 (1990) ("Congress did not exhibit the type of 'unambiguous intention to withdraw the Tucker Act remedy' that is necessary to preclude a Tucker Act claim." (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984))). *See also Ruckelshaus*, 467 U.S. at 1017 ("A withdrawal of jurisdiction would amount to a partial repeal of the Tucker Act. This Court has recognized, however, that repeals by implication are disfavored."). In *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1363–68 (Fed. Cir. 2005), the Federal Circuit rejected the applicability of a "nonappropriated funds" theory to jurisdiction of constitutional takings claims, citing *Presault* and the *Regional Rail Reorganization Act Cases*. A similar contention was rejected in the context of statutory violations, *see El-Sheikh v. United States*, 177 F.3d 1321, 1324–25 (Fed. Cir. 1999) (rejecting application of nonappropriated funds theory to claim for statutory violation in employee's Fair Labor Standards Act suit). In several contract cases, the Court of Claims likewise described the applicable test as providing that "when a federal instrumentality acts within its statutory authority to carry out defendant's purposes, the United States submits itself to liability under the Tucker Act unless 'some specific provi-

sion to the contrary' exists." *Butz Engineering*, 499 F.2d at 622; *Breitbeck*, 500 F.2d at 558 (same); *Convery*, 597 F.2d at 729 (same). In *Convery* the court distinguished *Kyer* and held that the United States was subject to Tucker Act jurisdiction for contracts of the General Services Administration; the court stated that "we think this is an appropriate case for directing attention to the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 125-36 (1974), wherein the Supreme Court made it abundantly clear that stronger and more explicit statutory language than that relied on by defendant is required to deprive a claimant of his Tucker Act remedy." *Convery*, 597 F.2d at 730.

In other cases in which the Federal Circuit applied the *Kyer* statement that the Judgment Fund statute is a "limitation" on the Tucker Act, the court found no jurisdiction based on the fact that the agencies in question were not supported by appropriated funds. These cases held that there was not Tucker Act jurisdiction over breach of contract by the Federal Housing Finance Board (*Furash & Co. v. United States*, 252 F.3d 1336 (Fed. Cir. 2001)), the Federal Prison Industries (*Core Concepts of Fla., Inc. v. United States*, 327 F.3d 1331 (Fed. Cir. 2003)), and the United States Mint (*AINS, Inc. v. United States*, 365 F.3d 1333 (Fed. Cir. 2004)). In each case the court reasoned that each of these entities receives support from sources other than congressional appropriation, and therefore that Tucker Act suit is not available, although there was no legislative withholding of such jurisdiction.

In *Furash* the court held that the Federal Housing Finance Board is a nonappropriated funds instrumentality because there is "no situation in which appropriated funds would be used to make up a deficiency" in the Board's housing finance operations. 252 F.3d at 1340. In *Core Concepts* the court held that Congress intended that

the Federal Prison Industries would be self-sufficient, and thus "providing a 'firm indication' that it intended to absolve appropriated funds from liability for FPI's actions," 327 F.3d at 1337. In *AINS* the court held that the U.S. Mint is a nonappropriated funds instrumentality because it "*does not* receive its monies by congressional appropriation" and it "derives its funding primarily through its own activities"; the court observed that "[t]here does not appear to be any mechanism whereby the Mint could receive appropriated funds without a statutory amendment," for it was intended to be "self-financing and distinct from the general fund." 365 F.3d at 1343.

The *Kyer* line of cases is here invoked by the government for application to the Federal Deposit Insurance Corporation, as requiring that "[j]urisdiction under the Tucker Act is 'limited, however, by the general requirement that judgments awarded against the government be paid out of appropriated funds,'" Gov't Br. 9 (quoting *Core Concepts*, 327 F.3d at 1334). The government argues that "absent an *express statutory provision* establishing that the agency will be funded by public monies," there can be no Tucker Act jurisdiction of the FDIC's breaches of contract. *Id.* at 28–29.

Recognizing the importance of this Tucker Act issue both in general and as applied to a major governmental entity such as the Federal Deposit Insurance Corporation, we turn to the application of statute and precedent to this jurisdictional issue and to its application to the agency involved in this case.

## II

### THE FEDERAL DEPOSIT INSURANCE CORPORATION

The government raises several arguments to support its position that there is not Tucker Act jurisdiction of claims based on contract breaches by the Federal Deposit Insurance Corporation.

### A.  The 1970 amendment to the Tucker Act

In 1970 Congress overturned the judicial rulings that had denied jurisdiction of contract breaches by certain military-related instrumentalities, and added the following sentence to the Tucker Act:

> For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

Pub. L. No. 91-350, §1(b), 84 Stat. 449 (1970) (now codified at 28 U.S.C. §1491(a)(1)).  The same amendment was added to the "Little" Tucker Act, 28 U.S.C. §1346(a)(2).

The government argues that this amendment, because of its explicit terms, means that all other federal entities that do not receive appropriated funds are excluded from the jurisdiction of the Tucker Act.  The government states that because Congress listed only the military and NASA exchanges in the amendment as enacted, although an earlier draft included all nonappropriated fund activities, this means that every other nonappropriated fund activity was intended to be excluded from Tucker Act jurisdiction.  On this interpretation of the 1970 amendment, the government argues that con-

tracts with the Federal Deposit Insurance Corporation are not subject to Tucker Act jurisdiction.

Broader language had indeed been proposed during the legislative inquiry, but this history does not support the government's theory that Congress intended to narrow, rather than restore, the Tucker Act's scope. A bill introduced by Senator Tydings on March 14, 1968 included any "nonappropriated fund activity of or under a department, agency, or Armed Force of the United States." S. 1363, 90th Cong. (1968). At the first Senate hearings on the proposed bill, as summarized by Senator Tydings:

> All of the witnesses agreed that there was no rational policy ground that would justify the continuation of the anachronistic immunity from suits of nonappropriated fund activities, when Congress has already waived such protection from suits on contracts of the U.S. Government itself, and the courts have held the nonappropriated fund activities to be instrumentalities of the United States for purposes other than suit.

115 Cong. Rec. 3163 (1969). The hearing record is unremitting in its criticism of the decisions removing "nonappropriated fund activities" from access to judicial remedy. However, during the hearings, concerns emerged about subjecting "all" nonappropriated fund activities to the Tucker Act when the nature and extent of such activities were unknown, and also because some such activities were subject to specific jurisdictional statutes or not under government control. *See id.* (naming the American Red Cross and the Tennessee Valley Authority as examples).

A second Senate hearing again showed agreement with respect to suits based on actions of the military

exchanges, but repeated the concern about certain "procurement activities of groups not subject to control by the responsible officials of the Government."  S. Rep. No. 91-268, at 5 (1969).  Recognizing the difficulty of definition, Senator Tydings asked each witness whether Congress should attempt a definition of "nonappropriated fund activities," but those testifying found such specificity unnecessary.  The committee report explained that the purpose of the bill was to correct the "injustice and inequity" worked by the judicial "loophole" to the Tucker Act, *id.* at 2, and several written submissions attached to the report pointed up the uncertainty of definition of the "nonappropriated fund activities" the bill would cover.  The Department of Justice recommended limiting this term to activities "subject to the supervision and control" of a department or agency.  *Id.* at 11.  The Department of Agriculture expressed concern about possible liability for contracts made by "informal associations of employees for recreational purposes."  *Id.* at 12.  NASA suggested that clarity was needed for certain "semiofficial activities, such as bowling leagues, employee clubs, and baseball teams, operating incidentally to Government agencies."  *Id.* at 15.  No universally satisfactory definition emerged, and the Senate eventually passed the bill without restrictive definition, the Senate Committee on the Judiciary reporting that "a legislative definition of a nonappropriated fund activity was clearly not necessary. . . . [A]ny attempt to limit the courts in their determination of what is and what is not a 'nonappropriated fund activity . . .' would ultimately serve to create additional loopholes through which clever defendants may ultimately retreat into the anachronism of governmental immunity that the bill seeks to eradicate."  *Id.* at 6.

However, during the House hearings concern about the absence of a definition for "nonappropriated fund

activity" was the subject of an extensive record, *see Jurisdiction of U.S. Courts—Nonappropriated Fund Activities: Hearings Before Subcommittee No. 4 of the House Committee on the Judiciary on S. 980*, 91st Cong. (1969). Congressman Wiggins expressed particular concern about the vagueness of the term in his questioning of several witnesses. A colloquy between Lt. Col. Benjamin Rosker of the Air Force Judge Advocate General Department and Congressman Wiggins is illustrative:

> MR. WIGGINS: Let me restate the question. I am worried about the definition of "nonappropriated funds." Every time I think of one, you give me another one; then I think of another possibility. But let's suppose we took all the guesswork out of the matter and said we are going to solve the problem of the PX's for all branches of the armed services. How much of the problem are we solving if we do that?

> COLONEL ROSKER: If I understand you correctly, I think you are suggesting that there be a limitation on suits only against the PX's.

> MR. WIGGINS: I am just throwing that out now as a way of avoiding the possibility of open-ended definition.

> COLONEL ROSKER: Naturally from a dollar standpoint, the PX's spend a massive percent of the dollars involved as far as expenditures of nonappropriated funds. But I think that the whole concept is that each and every one of these funds really serve just as much a governmental purpose as the other.

> MR. WIGGINS: I understand what you are saying, but that assumes we can identify the funds

we are talking about. But with this very vague definition, we may not be able to do that.

*Id.* at 18–19.

In the House, the concern was eventually resolved by limiting the bill to the military exchanges, as Congressman Wiggins had suggested to Colonel Rosker. The House Report explained that the Committee had

concluded that the complete removal of sovereign immunity for *all* nonappropriated fund activities would be undesirable for several reasons:

First, since not every nonappropriated fund activity has sufficient assets to reimburse the United States, the cost of the judgment would in some cases be imposed on the taxpayer—a result which is inconsistent with the very concept of nonappropriated fund activities.

Second, the broad inclusion of all nonappropriated fund activities might create serious definitional questions, making it difficult to predict the outer limits of the liability of the Federal Government.

Third, data concerning all of the nonappropriated fund activities of the United States is unavailable. The Bureau of the Budget has not compiled such data nor can such data be obtained from the various Government agencies under which nonappropriated fund activities are conducted. Clearly, Congress ought not to expose the Federal Government to liability for *all* nonappropriated fund activities unless such data is assembled.

H.R. Rep. No. 91-933, at 3 (1970). The House version was duly enacted into law.

The legislative record belies the government's argument that the specificity of this amendment means that Congress intended to exclude from the jurisdiction of the Tucker Act every government entity that does not receive support from appropriated funds except for the military and NASA Exchanges. In *McDonald's Corp. v. United States*, 926 F.2d 1126 (Fed. Cir. 1991), the court reviewed this legislative history, and rejected the government's position that "[a]ny organization not explicitly named, and which obligated any insubstantial amount of nonappropriated funding, would retain an immunity that Congress found to be a loophole in need of closing, thereby creating a new, although smaller, loophole in the bulwark Congress concluded should be solid." *Id.* at 1132.

The clearly stated purpose of the amendment was to restore access to the courts where such access had been removed, not to extend the removal into new, unknown areas. "Going behind the plain language of a statute in search of a possibly contrary congressional intent is a step to be taken cautiously even under the best of circumstances." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 75 (1982). Nonetheless, this argument is again pressed.

Legislative action to close a much-criticized loophole cannot reasonably be understood as an endorsement of the loophole itself, and certainly not an endorsement of its future application. Nothing in the 1970 amendment or its history suggests that Congress approved of the reasoning behind the judicial decisions it was overturning. It cannot be inferred that Congress, by omitting the long-terminated Grape Crush Administrative Committee from the 1970 amendment,[4] intended to endorse the ruling

---

[4] The Grape Crush Administrative Committee was terminated in December 1964 pursuant to 7 U.S.C. §608c(16) (1964). *See Kyer*, 369 F.2d at 719 n.18.

that *Kyer* applied to this Committee. The Court has cautioned that it is "impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the [courts'] statutory interpretation," *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994). "We walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle." *Id.* (quoting *Helvering v. Hallock*, 309 U.S. 106, 121 (1940)).

In assessing the 1970 legislation, the legislative record shows that the proponents of that legislation were principally concerned with the narrow problem of the military post exchanges, and they eventually directed their solution to this problem. Although Congress ultimately decided to leave unchanged the general line of judicial authority, the decision not to legislate in areas whose boundaries could not be defined did not constitute an endorsement of all judicial rulings relating to instrumentalities for which no agency was able to provide a precise definition. There is a difference between Congress' choosing not to upset a preexisting line of judicial authority and choosing to adopt that line of authority as a legislative mandate that would render it immune to subsequent efforts at judicial modification. The 1970 legislation did the former, but not the latter. Congress did not abrogate the *Kyer* line of authority, but that is not to say that it approved of that line of authority, much less adopted it.

The government argues that even if the legislative history of the 1970 amendment is not helpful to it, the Supreme Court thereafter endorsed the exclusion of nonappropriated fund instrumentalities from the Tucker Act despite the amendment, citing *United States v. Hopkins*, 427 U.S. 123 (1976), and *Army & Air Force Exchange Service v. Sheehan*, 456 U.S. 728 (1982). *See* Gov't

Br. 11; Reply Br. 23. However, in neither of these decisions did the Court depart from the 1970 amendment or apply it to activities other than the military exchanges. *Hopkins* involved a pay claim by a discharged employee of a post exchange, and the Court granted certiorari to resolve a conflict concerning whether Tucker Act contract actions include employment contracts with exchanges. *See* 427 U.S. at 124 (resolving conflicting rulings between *Young v. United States*, 498 F.2d 1211 (5th Cir. 1974) and *Hopkins v. United States*, 513 F.2d 1360 (Ct. Cl. 1975)). The Court observed that the 1970 amendment returned the military exchanges to the Tucker Act, 427 U.S. at 125–26, and held that this included employment contracts with the military exchanges, *id.* at 126.

Similarly in *Sheehan*, the Court was not concerned with nonappropriated fund entities beyond those listed in the 1970 amendment. *Sheehan* involved the question of whether a military exchange's violation of its own regulations could be deemed a breach of an implied-in-fact contract, thus bringing a discharged employee's claim within the jurisdiction of the Tucker Act. The Court noted that the 1970 amendment closed a jurisdictional "loophole." 456 U.S. at 734 n.4. There was no discussion of the status of other nonappropriated fund instrumentalities under the Tucker Act.

The legislative and judicial histories of the 1970 amendment stress the restoration of the full scope of the Tucker Act's waiver of immunity, without imposing limitations grounded in the source of the government entity's funds. The amendment and its history contain no support for the theory that Tucker Act jurisdiction was intended to be withheld from all entities that do not receive appropriated funds except the military and NASA exchanges. No congressional intent, or national purpose,

supports the government's proposed view of the 1970 amendment.

### B.   The "sue and be sued" clause and corporate status

The FDIC is authorized by statute "[t]o sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal." 12 U.S.C. §1819(a)(Fourth); *see also id.* at 1819(b)(2)(a). The government argues that suit for breach of contract must be pursued against the FDIC in district court. However, it is well established that the potential availability of a remedy in district court does not of itself withdraw jurisdiction under the Tucker Act.

In *Butz Engineering* the Court of Claims explained that authorization to a government agency to sue and be sued in the district court is not a negation of Tucker Act jurisdiction. The court stated that "it is well settled that an agency's 'sue-and-be-sued' clause does not nullify the concurrent liability of the United States as principal." *Id.* at 625. *See also Bank of Newark*, 357 F.2d at 711 ("[W]e have concurrent jurisdiction with 'any court of competent jurisdiction, State or Federal,' to entertain plaintiffs' claims. Our jurisdiction is derived from the Tucker Act and that of the other courts is derived from the FHA's 'to sue and be sued' clause." (quoting 12 U.S.C. §1702)).

A similar sue and be sued provision relating to the savings-and-loan insurance fund was considered in *Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision*, 930 F.2d 883, 889 (Fed. Cir. 1991), the court holding that the statutory authorization for suit by and against the Office of Thrift Supervision in district court did not remove the Tucker Act jurisdiction of the Court of Federal Claims with respect to contracts made by the Office. We discern no basis for viewing the sue and be

sued clause for the Federal Deposit Insurance Corporation differently from the Federal Savings and Loan Insurance Corporation—or indeed differently from any other federal agency as to this aspect.

With respect to the corporate status of the FDIC, it is established beyond dispute that the jurisdictional criterion is not whether the government entity is incorporated, but whether it is acting on authority of the United States. *See, e.g.*, *Cherry Cotton Mills*, 327 U.S. at 539 ("That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely Governmental purposes."); *Nat'l Cored Forgings Co. v. United States*, 132 F. Supp. 454, 458 (Ct. Cl. 1953) ("When a Government corporation acting within the scope of its statutory authority makes a contract as the agent of the United States, the United States may be sued in this court as principal on the contract."); *Crooks Terminal Warehouses, Inc. v. United States*, 92 Ct. Cl. 401, 414 (1941) (holding that the Federal Surplus Commodities Corporation had authority to bind the government by contract, for "the corporation was created solely to perform governmental objectives and it so acted," and thus claims for breach of contract are within Tucker Act jurisdiction).

No provision of the FDIC statute, and no precedent, suggests that either the "sue and be sued" provision or the agency's corporate status, or both together, are a withdrawal of Tucker Act jurisdiction. Any such withdrawal must be specific and unambiguous. *Regional Rail Cases,* 419 U.S. at 126.

## C.   Payment of FDIC judgments

The government argues that "[i]f Congress did not stipulate that Federal funds may be used to pay a judgment against a government instrumentality, the Court of Federal Claims does not possess jurisdiction to hear the claim." Gov't Br. 10. The government's theory relies on the *Kyer* holding that access to the Judgment Fund is a "limitation" on Tucker Act jurisdiction. *See id.* at 9 (citing Judgment Fund statute, 28 U.S.C. §2517(a)).

In most of the cases since *Kyer*, the Court of Claims distinguished *Kyer* on its facts. For example, in *L'Enfant Plaza Properties, Inc. v. United States*, 668 F.2d 1211 (Ct. Cl. 1982), the court described *Kyer* as holding that: "The jurisdictional grant under the Tucker Act is limited by the fact that judgments awarded by this court are to be paid out of appropriated monies. 28 U.S.C. §2517 (1976). Jurisdiction can only be exercised, therefore, over cases in which appropriated funds can be obligated." 668 F.2d at 1212. However, that court distinguished *Kyer* on its facts and concluded that "[j]urisdiction under the Tucker Act must be exercised absent a firm indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts of the Comptroller," *id.*, citing the *Regional Rail Reorganization Act Cases*. The court explained that although the Comptroller had not recently been supported by appropriated funds, the relevant legislation did not "preclude Congressional appropriation of funds to the Comptroller," *id.*, whether or not funds were actually appropriated. On this reasoning the court held that the jurisdictional "limitation" in *Kyer* did not apply.

The government cites *Wolverine Supply, Inc. v. United States*, 17 Cl. Ct. 190 (1989), as requiring that there is not Tucker Act jurisdiction of this claim against the FDIC.

Gov't Br. 10.  In *Wolverine Supply*, the Claims Court (as the Court of Federal Claims was previously named) held that because the contract for construction of a recreational area at an Air Force base stated that the contract was to be paid from nonappropriated funds, the court did not have jurisdiction under the Tucker Act.  This case illustrates the continuing inconsistency flowing from the *Kyer* statement that "to remain within the framework of our jurisdiction, it is essential that the contract sued on be one which could have been satisfied out of appropriated funds." *Kyer*, 369 F.2d at 718.

The inclusion of the Judgment Fund as a jurisdictional "limitation" of claims within the scope of the Tucker Act has received scholarly criticism.  It has been described as requiring a "second layer of appropriations" as a condition of bringing claims against the government.  *See* Evan C. Zoldan, *The King is Dead, Long Live the King!: Sovereign Immunity and the Curious Case of Nonappropriated Fund Instrumentalities*, 38 Conn. L. Rev. 455, 490 (2006). This purported restriction on Tucker Act jurisdiction is in tension with the Court's reminder in *Mitchell* that no "second waiver" of immunity is required for jurisdiction under the Tucker Act.  *See* 463 U.S. at 218 ("[A] court need not find consent to suit in 'any express or implied contract with the United States.'  The Tucker Act itself provides the necessary consent." (quoting 28 U.S.C. §1491)).  The Court in *Mitchell* stressed that "by giving the Court of Claims jurisdiction over specified types of claims against the United States, the Tucker Act constitutes a waiver of sovereign immunity with respect to those claims." *Id.* at 212 (footnote omitted).  The Court stated that: "If a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit." *Id.* at 216.

Neither the Tucker Act, nor Supreme Court precedent, nor most of the jurisprudence of the Court of Claims and the Federal Circuit, limits jurisdiction over the claim by the source of funds to pay any judgment on the claim. As the government acknowledges, the purpose of the Judgment Fund statute, 28 U.S.C. §2517(a), is to provide a fund to pay judgments of the Court of Claims and its successor court "instead of requiring specific bills for each successful claimant," Reply Br. 6. Nonetheless the government argues that §2517(a) requires that the United States cannot be sued under the Tucker Act unless there is a specific—not a general—appropriation to pay the judgment, "ensuring that judgments were paid only by appropriations specifically for that purpose." *Id.* at 7.

The government's citation of authority for this argument suggests a misunderstanding of the history of §2517(a), for in its opening and reply briefs the government presents the following quote from *Williams v. United States*, 289 U.S. 553, 562–63 (1933), as a binding holding of the Supreme Court: "no money shall be paid out of the treasury for any claim passed upon by the court of claims till after an appropriation therefor shall be estimated for by the Secretary of the Treasury." Gov't Br. 9; Reply Br. 8–9. The quoted words indeed appear in *Williams*, for the Court was quoting Section 14 of the Amended Court of Claims Act of 1863, which, as *Williams* also states, was repealed in 1866. *See Williams*, 289 U.S. at 564 ("At the next session of Congress section 14 was repealed."). Since 1866, §2517(a) has not contained the restriction now attributed to it.

The purpose of the Judgment Fund was to avoid the need for specific appropriations to pay judgments awarded by the Court of Claims. The government argues that the Judgment Fund is not available for FDIC breaches because neither the FDIC statute, nor any other

statute, provides such a specific appropriation. According to the government, "if Congress intended that the Government would be liable for judgments against the FDIC in its capacity as insurer of banks, it would have made that obligation clear – as it did when it established the [FSLIC Resolution Fund] to fund judgments against the FSLIC in *Winstar*-related litigation." Gov't Br. 22. The government thus argues that although the Tucker Act does provide jurisdiction of actions for breach of contracts with the FSLIC, it does not provide jurisdiction for contracts with the counterpart FDIC.

The distinction between the FSLIC (for savings and loan institutions) and the FDIC (initially for savings banks) does not support a jurisdictional distinction under the Tucker Act. Jurisdiction of claims arising from breaches by either agency tracks the unchallenged Tucker Act jurisdiction of the *Winstar* cases, which initially arose on FSLIC contracts, and came to include FDIC contracts. No challenge was raised to Tucker Act jurisdiction based on the source of funding of these agencies, either before or after the FSLIC exhausted its fee-raised funds and its liabilities were resolved by the Resolution Trust Fund using funds appropriated for the purpose. The jurisdiction of the Court of Federal Claims did not depend on whether the FSLIC had exhausted its insurance fund when the breach occurred or when the action was brought or resolved; jurisdiction depended on whether the statutory conditions of the Tucker Act were met, as to subject matter and as to parties. *See Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) (statutory requirements are not properly described as "jurisdictional" unless they "delineat[e] the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority").

The principles and the factual premises are virtually identical in this suit and in the many suits arising from breached contracts of the FSLIC. The Tucker Act challenge now presented was not raised in *United States v. Winstar Corp.*, 518 U.S. 839 (1996), which arose on contracts with the FSLIC. The government now proposes that the reason why jurisdiction was proper when the FSLIC was the breaching entity is that the FSLIC obligations were met by congressional appropriation after the FSLIC exhausted its fee-derived funds. *See* 12 U.S.C. §1821a(a) (creating FSLIC Resolution Fund to resolve assets and liabilities of the FSLIC); *id.* §1821a(c) (authorizing appropriations necessary to meet any shortfall in the FSLIC Resolution Fund). These expedients have no relation to jurisdiction, and were not so characterized by Congress or in any *Winstar* decision.

The appropriation provisions of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) were an appropriation to pay governmental obligations, not a prohibition on Tucker Act jurisdiction for breaches by the agency. Tucker Act jurisdiction of the many claims for breach of contract by the FSLIC did not depend on how the government met its obligations, either before or after the FSLIC funds were exhausted. Absent specific statutory provision addressing jurisdiction, Tucker Act jurisdiction is not affected by how the agency meets its obligations or how any judgment establishing those obligations is satisfied.

#### D.  The full faith and credit of the United States

Congressional pronouncements stress the full faith and credit of the United States in connection with the FDIC. *See Slattery II*, 583 F.3d at 810–11. However, the government states that "these congressional pronouncements are irrelevant" to the FDIC's regulatory obliga-

tions. Reply Br. 15. This position is contrary to the opinions of the Attorney General and the Comptroller General, issued when the question arose with respect to the FSLIC. A Comptroller General letter stated, in response to an inquiry from Congress:

> 2. Comptroller General letter concludes that FSLIC obligations are obligations of the United States backed by its full faith and credit since no general liability of the United States has been statutorily disclaimed. Conclusion is based on analysis that FSLIC is an instrumentality of the United States, has been designated by Congress to carry out a program of insurance and regulation, and issues notes and guarantees under statutory authority. Analysis used is based on series of Attorney General opinions.
>
> * * * *
>
> Your second question asks whether the promissory notes and assistance guarantees issued by FSLIC are backed by the full faith and credit of the United States. Applying the criteria contained in a long line of Attorney General opinions, we are of the opinion that FSLIC's promissory notes and assistance guarantees are obligations of the United States, backed by its full faith and credit. A detailed analysis of this issue also is enclosed.

68 Comp. Gen. 14, 1988 WL 223985 (Oct. 11, 1988).

The Comptroller General letter cited a series of rulings of the Attorney General concerning obligations of the United States with respect to various governmental activities; *e.g.*, 42 Op. A.G. 327 (1966) (guarantees of the Import-Export Bank, a government corporation, are

obligations of the United States); 42 Op. A.G. 21 (1961) (loan guarantees made by the Development Loan Fund under the Mutual Security Act of 1954 are obligations of the United States despite corporate status of the Fund); 41 Op. A.G. 424 (1959) (loan guarantees issued by the Secretary of Defense under the Armed Services housing mortgage insurance program are obligations of the United States); 41 Op. A.G. 403 (1959) (guarantees by the Interstate Commerce Commission are obligations of the United States despite absence of an explicit pledge of the full faith and credit of the United States); 41 Op. A.G. 363 (1958) (contracts entered by Secretary of Commerce to insure loans and mortgages pursuant to the Merchant Marine Act of 1936 are binding obligations of the United States, despite need for future appropriations); 41 Op. A.G. 138 (1953) (contracts between Public Housing Administration and local public housing agencies are binding obligations of the United States). In *Bank of Newark*, 357 F.2d at 711–12, the Court of Claims observed that the debentures of the Housing Insurance Fund were backed by the full faith and credit of the United States, in discussing Tucker Act jurisdiction.

The Attorney General's and Comptroller General's rulings contravene the government's position concerning the FDIC. The FDIC is an agency of the United States. 12 U.S.C. §1819(b)(1); *see* 12 U.S.C. §1813(z) ("The term 'Federal banking agency' means the Comptroller of the Currency, the Director of the Office of Thrift Supervision, the Board of Governors of the Federal Reserve System, or the Federal Deposit Insurance Corporation."). FDIC directors are appointed by the President and confirmed by the Senate, and the FDIC is required to report annually to Congress and quarterly to the Treasury. *See id.* §§1812(a), 1827. The FDIC has free use of the United States mails "in the same manner as the executive de-

partments of the Government," *id.* §1820(a), and is exempt from state and federal income taxes, *id.* §1825. The FDIC is empowered to regulate bank management, operations, capital, accounting, and executive compensation. The FDIC is authorized to issue subpoenas, block the hiring of unapproved executives, prevent or require remedial action such as mergers, terminate a bank's deposit insurance, and liquidate or otherwise resolve failed or failing banks, *see id.* §§1814–1818, 1819, 1820, 1821, 1823, 1828 1831i, 1831o, 1831p-1, and is granted "such incidental powers as shall be necessary to carry out the powers" specifically granted, *id.* §1819(a)(Seventh).

The FDIC is authorized "[t]o make contracts." *Id.* §1819(a)(Third). The government's argument that the full faith and credit of the United States does not apply to the FDIC's contractual obligations, including the notes, guarantees, and promises made for the purpose of averting bank failure, are without foundation. The legislative purpose, judicial precedent, and the views of the Comptroller General and the Attorney General, are contrary to this position.

### E.   The self-supporting structure of the FDIC

The government also argues that the FDIC is self-supporting without congressional appropriations, and that this too negates Tucker Act jurisdiction. When the FDIC was created in 1933, it was funded with an appropriation of $150 million. The FDIC was authorized to charge fees to the banks that it insures, and it has since its inception been funded by these fees, and repaid the initial appropriation. *See* Gov't Br. 13, 15–16. Thus the government argues that appropriated funds do not support the FDIC.

The FDIC is authorized to borrow from the Treasury, with borrowing limits that have periodically been increased, from $3 billion in 1950 to $5 billion in 1989, then to $30 billion in 1991, then to $100 billion in 2009, with a temporary increase to $500 billion through the end of 2010 if needed and approved by Treasury, *see* 12 U.S.C.A. §1824(a)(3)(A) (West 2009). The government argues that although the FDIC has now exhausted its funds it has not borrowed from the Treasury, instead meeting its current shortfall by requiring member banks to make advance payments. None of these expedients excludes or withdraws Tucker Act jurisdiction of claims within the subject matter set forth in the Tucker Act.

In view of the conflicts in precedent that led to this *en banc* rehearing, we resolve the conflicts as follows:

## III

### RESOLUTION OF CONFLICTS

Over the long history of the Tucker Act, the courts have respected the nation's intention to provide a broad waiver of immunity for claims against the government. Apart from the Court of Claims' explanation of its ruling in *Kyer* with respect to the Grape Crush Administrative Committee and the extension of this ruling to cases falling directly within the rule articulated in *Kyer*, the government's argument that Tucker Act jurisdiction is limited by access to the Judgment Fund, or varies with the self-sufficiency of the activity, is devoid of support. We resolve "the confusion generated by the 'less than meticulous' uses of the term 'jurisdictional' in our earlier cases," *Eberhart v. United States*, 546 U.S. 12, 16 (2005), and hold that the source of funding of an agency's activities or for payment of its judgments is not a limitation on Tucker Act jurisdiction. The Judgment Fund statute is not properly deemed "jurisdictional," for it "does not speak

in jurisdictional terms or refer in any way to the jurisdiction of the [court]." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982).

The Court explained in *Kontrick v. Ryan*, 540 U.S. at 455, that statutory requirements are not "jurisdictional" unless they "delineat[e] the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." The Court elaborated in *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006) that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." "In light of the important distinctions between jurisdictional prescriptions and claim-processing rules," the Court has "encouraged federal courts and litigants to 'facilitat[e]' clarity by using the term 'jurisdictional' only when it is apposite." *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1244 (2010) (alteration in original). The Court's "recent cases evince a marked desire to curtail such 'drive-by jurisdictional rulings,'" *id.* (quoting *Steel Co. v. Citizens For A Better Env't*, 523 U.S. 83, 91 (1998)), that "miss the 'critical difference[s]' between true jurisdictional conditions and nonjurisdictional limitations on causes of action," *id.* (alteration in original).

Applying these precepts, the overreach of the statement in *Kyer* is apparent, for the Judgment Fund statute does not speak in jurisdictional terms. Section 2517(a) originated in the Amended Court of Claims Act of 1863, for the purpose of removing the need for a specific congressional appropriation to pay each judgment. This statute neither restricted nor enlarged the jurisdiction of the Court of Claims; it is applied after the court has entered final judgment, to provide a mechanism whereby that judgment "shall be paid out of any general appropriation therefor." The contrary statement in the *Kyer*

decision and the cases that relied on *Kyer* shall no longer be applied as precedent. We reaffirm the guidance of *Mitchell*, 463 U.S. at 216, that "[i]f a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit"; exceptions require an unambiguous statement by Congress, *see Regional Rail Reorganization Act Cases*, 419 U.S. at 126–36; *Presault*, 494 U.S. at 12 ("Congress did not exhibit the type of 'unambiguous intention to withdraw the Tucker Act remedy' that is necessary to preclude a Tucker Act claim." (quoting *Ruckelshaus*, 467 U.S. at 1019)).

On this *en banc* review, we hold that (1) when a government agency is asserted to have breached an express or implied contract that it entered on behalf of the United States, there is Tucker Act jurisdiction of the cause unless such jurisdiction was explicitly withheld or withdrawn by statute, and (2) the jurisdictional foundation of the Tucker Act is not limited by the appropriation status of the agency's funds or the source of funds by which any judgment may be paid.

Thus jurisdiction of this claim was properly exercised by the Court of Federal Claims. The decision in *Slattery II*, reported at *Slattery v. United States*, 583 F.3d 800 (Fed. Cir. 2009), is reinstated; Part I, the jurisdictional section of *Slattery II*, is modified to resolve conflicting precedent as set forth herein. We remand to the Court of Federal Claims for further proceedings as set forth therein.

**JUDGMENT REINSTATED; CASE REMANDED**

# United States Court of Appeals
## for the Federal Circuit

---

**FRANK P. SLATTERY, JR., (ON BEHALF OF HIMSELF
AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED
SHAREHOLDERS OF MERITOR SAVINGS BANK),**
*Plaintiff-Cross Appellant,*

AND

**STEVEN ROTH,
AND INTERSTATE PROPERTIES,**
*Plaintiffs-Cross Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2007-5063, -5064, -5089

---

Appeal from the United States Court of Federal Claims in Case No. 93-CV-280, Senior Judge Loren A. Smith.

---

GAJARSA, *Circuit Judge*, dissenting, with whom DYK, PROST, and O'MALLEY, *Circuit Judges*, join.

It has been settled law for more than half a century that the Tucker Act's waiver of sovereign immunity does not apply to contracts entered into by nonappropriated fund instrumentalities ("NAFIs") of the federal govern-

ment. This settled law is recognized and endorsed by Congress and the Supreme Court. It is also settled law that no federal court may enlarge its jurisdiction; only Congress may do so. Nevertheless, the court today overturns and eviscerates the vast body of NAFI law in one fell swoop. The court is wrong to do so, and I therefore dissent.

A.

The central question here is what entities are included in the phrase "the United States" as used in the Tucker Act's reference to claims founded "upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The term "United States" in that part of the Tucker Act is ambiguous as to whether it includes each and every Federal agency.[1] For more than sixty years the Supreme Court, our predecessor court, and our court have held that the term "United States" in the Tucker Act does not include NAFIs. The majority today eliminates the NAFI doctrine. The majority holds "that Tucker Act jurisdiction does not depend on and is not limited by whether the government entity receives or draws upon appropriated funds. Conflicting precedent shall no longer be relied upon." *Majority Op.* at 5. The sole question is whether "the government entity was acting on behalf of the government." *Id.*

---

[1] Notably, the term "United States" in the earlier part of the Tucker Act referring to "any claim against the United States" does not include separate Federal agencies. The Tucker Act does not authorize suit against Federal agencies, only the United States itself. *Hansen v. United States*, 214 Ct. Cl. 823, 1977 WL 25876 at *1 (Ct. Cl. 1977) (unpublished); *see also United States v. Sherwood*, 312 U.S. 584, 588 (1941). This clearly suggests that the term "United States" elsewhere in the statute does not include all Federal agencies

3

But the NAFI doctrine is not ours to eliminate; it is a long-standing doctrine of sovereign immunity born of the Supreme Court and recognized by Congress. As a court of appeals, we lack authority to abandon the doctrine. If we had a clean slate upon which to write new law, we could pursue a different path; however, we do not, and this court is not the legislative branch. The issue before this court—whether the Tucker Act waives the sovereign immunity of the United States for contractual commitments of the FDIC—is one of statutory construction. While the Tucker Act does not use the term "non-appropriated funds instrumentality," the statute and its legislative history must be read in the context of the Supreme Court's decisions.

The genesis of the NAFI doctrine is found in the Supreme Court's decision in *Standard Oil Co. of California v. Johnson*, 316 U.S. 481 (1942). In *Standard Oil*, the Court reviewed a California statute that imposed a license tax on the sale of motor vehicle fuel. 316 U.S. at 482. The statute exempted "any motor vehicle fuel sold to the government of the United States or any department thereof for official use of said government." *Id.* The question before the Court was whether a military post exchange qualified for the statute's exemption. *Id.* at 483. The Court held that the military post exchange was a federal instrumentality entitled to "whatever immunities it may have under the Constitution and federal statutes." *Id.* at 485. In classifying the post exchange as a federal instrumentality, the Court focused on the fact that "[t]he government assumes none of the financial obligations of the exchange." *Id.* at 485.

In the years following *Standard Oil*, the Court of Claims interpreted the decision as imposing a limitation on Tucker Act jurisdiction. In *Borden v. United States*, 116 F. Supp. 873 (Ct. Cl. 1953) and *Pulaski Cab Co. v.*

*United States*, 157 F. Supp. 955 (Ct. Cl. 1958), the Court of Claims held it lacked jurisdiction to adjudicate breach of contract actions against military exchanges. *See Borden*, 116 F. Supp. at 877 ("[I]n light of [*Standard Oil*] . . . we reluctantly reach the conclusion that plaintiff cannot sue the United States on a contract of employment which is signed by the Army Exchange Service . . . ."); *Pulaski Cab*, 157 F. Supp. at 958 ("We conclude that the United States has not consented to be sued upon a contract of this instrumentality . . . ."). The Court of Claims reached a similar conclusion in *Keetz v. United States*, 168 Ct. Cl. 205 (1964) (per curiam), though it recognized the inequities engendered by dismissing the plaintiff's suit. *Id.* at 205 ("We are aware that plaintiff is placed in somewhat of a difficult position . . . . However, we believe that in these situations (especially where the question of the waiver of sovereign immunity is involved) it is up to Congress to remedy this apparent harsh result, and the courts should refrain from legislating by judicial fiat.").

In *Kyer v. United States* the Court of Claims extended the NAFI doctrine beyond the realm of military exchanges by holding that the Grape Crush Administrative Committee ("Committee"), appointed by the Secretary of Agriculture, was a NAFI. 369 F.2d 714, 717-18 (Ct. Cl. 1966).[2] According to the Court of Claims, because the Committee was "neither supported by appropriations nor authorized, in any manner, to obligate such funds," it was a NAFI.

---

[2] The majority recognizes that *Kyer*'s extension of the NAFI concept beyond military exchanges is the direct ancestor of the NAFI doctrine, citing its progeny: *Furash & Co. v. United States*, 252 F.3d 1336 (Fed. Cir. 2001), *Core Concepts of Florida, Inc. v. United States*, 327 F.3d 1331 (Fed. Cir. 2003), and *AINS, Inc. v. United States*, 365 F.3d 1333 (Fed. Cir. 2004). *Majority Op.* at 23-24. The majority then attempts to distinguish *Kyer* and ultimately overturns it.

*Id.* at 718. The court then held it lacked jurisdiction to adjudicate a breach of contract action against the Committee because "to remain within the framework of our jurisdiction, it is essential that the contract sued on be one which could have been satisfied out of appropriated funds." *Id.* The Court of Claims reasoned that because its Tucker Act jurisdiction "must be read in conjunction with and must be regarded as limited by" 28 U.S.C. § 2517, which "provides that [Court of Claims] judgments are paid only from appropriated funds," any suit against a NAFI for breach of contract is beyond its jurisdiction. *Id.* at 717-18.

It was against the backdrop of this history that Congress in 1970 amended the original Tucker Act to include a provision directly relevant to the NAFI doctrine and today's ruling. As discussed above, the original Tucker Act provided the Court of Federal Claims with jurisdiction to hear, *inter alia*, a claim against the United States founded "upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (originally enacted as Tucker Act, ch. 359, 24 Stat. 505 (1887)). But Congress amended the original Tucker Act by adding the sentence: "For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States." Act of July 23, 1970, Pub. L. No. 91-350, § 1(b), 84 Stat. 449 ("1970 Act"). As a textual matter, the amendment applies only to the enumerated entities in light of the canon *expressio unius est exclusio alterius* (the express mention of one thing excludes all others). *See, e.g.*, *Tenn. Valley Authority v. Hill*, 437 U.S. 153, 188 (1978) (because the Endangered Species Act of 1973 "create[d] a number of

limited 'hardship exemptions'" and "no exemptions . . . for federal agencies," the Court found "under the maxim of *expressio unius est exclusio alterius* . . . that these were the only 'hardship cases' Congress intended to exempt"); *cf. Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) (noting the "frequently stated principle of statutory construction . . . that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies"). This appropriately narrow construction is further consistent with the general rule that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign" and that such a waiver "must be unequivocally expressed in [the] statutory text," *Lane v. Pena*, 518 U.S. 187, 192 (1996). That Congress intended and understood the amendment as extending Tucker Act jurisdiction only to the listed NAFI entities—to the exclusion of all others—is unequivocally confirmed by the amendment's legislative history.

Congress amended the Tucker Act in 1970 in part due to its concern that the NAFI doctrine created an inequitable loop-hole in the Tucker Act. Indeed, the original Senate bill sought to eliminate the NAFI doctrine entirely. It provided that "an express or implied contract with a nonappropriated fund activity of or under the United States or a department or agency of the United States shall be considered an express or implied contract with the United States." S. 980, 91st Cong. (1st Sess. 1969). The Senate report stated that:

> S. 980 will fill a gap in the Tucker Act's waiver of immunity of the United States to claims based upon contracts with departments or agencies of the Government. . . . The courts have repeatedly held . . . that the Federal Government's liability to

7

suit under [the Tucker Act] only exists with respect to contract obligations to be paid out of appropriated funds. *See, e.g.*, *Kyer v. United States*, 369 F.2d 714 (Ct. Claims 1966); *Pulaski Cab Co. v. United States*, 157 F. Supp. 955 (Ct. Claims 1968); *Keetz v. United States*, 168 Ct. Claims 205 (1964); *Borden v. United States*, 116 F. Supp. 873 (Ct. Claims 1953).

. . . .

Despite [the] consistent identification of the nonappropriated fund activity with its parent department or agency and the United States, contractors with such activities have found it impossible to get a "day in court" when they allege breach of contract by such activities. Your committee believes that there is no rational reason to continue the immunity from contract suit presently afforded nonappropriated fund activities. . . .

. . . .

. . . In so doing, S. 980 will erase an anachronistic and baseless distinction between suits on contracts of the United States to be paid out of appropriated funds and those to be paid out of nonappropriated funds.

S. Rep. No. 91-268, at 2-3, 5 (1969).

The House, however, strongly disagreed with the Senate's proposed elimination of the entire NAFI doctrine. The House report stated:

In evaluating the proposal as passed by the Senate, your committee concluded that the complete removal of sovereign immunity for *all* nonappropriated fund activities would be undesirable for several reasons:

First, since not every nonappropriated fund activity has sufficient assets to reimburse the United States [for the cost of a judgment, as required by S. 980], the cost of the judgment would in some cases be imposed on the taxpayer—a result which is inconsistent with the very concept of nonappropriated fund activities.

Second, the broad inclusion of all nonappropriated fund activities might create serious definitional questions, making it difficult to predict the outer limits of the liability of the Federal Government.

Third, data concerning all of the nonappropriated fund activities of the United States is unavailable. The Bureau of the Budget has not compiled such data nor can such data be obtained from the various Government agencies under which nonappropriated fund activities are conducted. Clearly, Congress ought not to expose the Federal Government to liability for *all* nonappropriated fund activities unless such data is assembled.

H.R. Rep. No. 91-933, at 3 (1970), *reprinted in* 1970 U.S.C.C.A.N. 3477, 3479 (emphasis in original).[3] Accordingly, the House amended the bill, limiting the NAFI exclusion to military post exchanges and NASA exchange councils. *Id.* The House version of the bill passed, 1970 Act § 1(b), 84 Stat. at 449, and the NAFI doctrine, albeit limited by the Congress, remains in effect today, 28

---

[3] The majority cites to the same language but refuses to accept its import: namely, that the House explicitly rejected the Senate's complete elimination of the NAFI doctrine.

U.S.C. § 1491(a)(1). By making clear that some NAFIs are within the definition of the "United States" for purposes of the Tucker Act, Congress made quite clear that other NAFIs are excluded. The majority's conclusion—premised on its interpretation of the legislative history to support its rationale that Congress eliminated all NAFIs—is illogical, just like talking about the shining moonlight on a sunny afternoon. There is simply no support for the majority's assertion that "[t]he legislative and judicial histories of the 1970 amendment stress the restoration of the full scope of the Tucker Act's waiver of immunity, without imposing limitations grounded in the source of the government entity's funds." *Majority Op.* at 32.

Consistent with this background, this court has repeatedly interpreted the 1970 Act as "a narrow exemption from the [NAFI] doctrine for certain entities," which left "the doctrine intact for all other non-appropriated fund instrumentalities unrelated to the post exchanges and exchange councils." *Furash & Co. v. United States*, 252 F.3d 1336, 1339 (Fed. Cir. 2001); *see also Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1365 (Fed. Cir. 2005); *AINS, Inc. v. United States*, 365 F.3d 1333, 1338-39 (Fed. Cir. 2004); *El-Sheikh v. United States*, 177 F.3d 1321, 1325 (Fed. Cir. 1999); *McDonald's Corp. v. United States*, 926 F.2d 1126, 1129-33 (Fed. Cir. 1991). In doing so, this court correctly reasoned that had Congress intended to eliminate the doctrine entirely, it would have adopted the Senate bill, not the House's amended version. Congress's action, therefore, speaks volumes. By leaving the doctrine in place, Congress ratified the Supreme Court decisions and our decisions defining it. [4]

---

[4] The majority's contrary argument—that Congress's choosing to enact only a narrow exception to the

Our analysis is confirmed by the Supreme Court's consistent teaching that a narrow statutory exception, crafted in response to specific judicial decisions, demonstrates Congress's awareness of those decisions. More specifically, the Court teaches that such an exception "lends powerful support" to the continued viability of the larger rule. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 418-19 (1986). For example, in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, the Court held that a statutory exception, exempting motor *contract* carriers from the decades-old filed-rates doctrine, "demonstrat[ed] that Congress is aware of the requirement and has deliberately chosen not to disturb it with respect to motor *common* carriers." 497 U.S. 116, 135 (1990). Similarly, in *Square D*, the Court refused to overturn a long-standing judicial doctrine when Congress specifically addressed a particular application, but declined to alter the larger rule. 476 U.S. at 418-20. Such rules of interpretation are corollary to the strong disfavor shown reversals of long-standing law. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977) ("[W]e must bear in mind that considerations of stare decisis weigh heavily in the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation"); *cf. Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739 (2002) (courts must use caution before adopting changes that disrupt settled expectations).

Moreover, we are not alone in considering the significance of the 1970 Act, as the Supreme Court addressed the act in *United States v. Hopkins*, 427 U.S. 123 (1976).

---

NAFI doctrine offers no guidance as to the continued viability of the doctrine itself—cites no authority, *Majority Op.* at 31, and is consistent only with the majority's studied indifference to precedent binding upon this court, *infra*.

11

In *Hopkins*, the Court considered whether a civilian employee of the Army and Air Force Exchange Service could sue the United States for breach of an employment contract with the exchange. *Id.* at 124. The Court first noted that its *Standard Oil* decision had formed "the basis of a series of decisions by the Court of Claims to the effect that it lacked jurisdiction over claims concerning the activities of nonappropriated fund instrumentalities." *Id.* at 125 (citing *Borden*, *Pulaski*, and *Kyer*). The Court took no exception with the Court of Claims' interpretation of *Standard Oil*, specifically defined a nonappropriated fund instrumentality as "one which does not receive its monies by congressional appropriation," *id.* at 125 n.2, and stated that "[t]he nonappropriated-fund status of the exchanges places them in a position whereby the Federal Government, absent special legislation, does not assume the obligations of those exchanges in the manner that contracts entered into by appropriated fund agencies are assumed," *id.* at 127. The Court then found such "special legislation" in the 1970 Act, which specifically addressed *Keetz*'s call for a Congressional remedy to the NAFI doctrine's apparent harsh result by providing that contracts with military exchanges shall be considered contracts with the United States. *See id.* at 125-26 ("The purpose of the bill was clearly to provide a remedy to 'contractors' with nonappropriated fund instrumentalities."). According to the Court, the 1970 Act waived the sovereign immunity of the United States and conferred jurisdiction on the Court of Claims for breach of contract claims against military exchanges. *Id.* The Supreme Court therefore recognized that the 1970 Act was, as we subsequently stated, "a narrow exemption from the [NAFI] doctrine for certain entities." *Furash*, 252 F.3d at 1339.

Our statutory construction of the Tucker Act finds further support in the legislative history of the Contract Disputes Act, 41 U.S.C. §§ 601-613 ("CDA"). The CDA permits contractors to sue the federal government for breach of contract and applies "to any express or implied contract (including those of the non-appropriated fund activities described in sections 1346 and 1491 of title 28) entered into by an executive agency for . . . (2) the procurement of services." *Id.* § 602.

Following the CDA's passage, a question was raised whether the Tucker Act's NAFI doctrine applied with equal vigor to the CDA. We addressed this question in *Furash* and, in doing so, considered the CDA's legislative history. *See* 252 F.3d at 1342-44. We concluded that "for CDA jurisdiction to be foreclosed, Congress must make clear that the activity in question was intended to operate without appropriated funds, the same standard that is used under the Tucker Act." *Id.* at 1342. To bolster our conclusion, we turned to the CDA's legislative history, "which makes clear that Congress did not intend for the CDA to apply to non-appropriated fund instrumentalities except for those specifically identified in the [Tucker] Act." *See id.* at 1343-44. We pointed to a Senate report, which explicitly addressed the NAFI doctrine:

> The bill expressly states its applicability to those nonappropriated fund activities over which the courts presently have jurisdiction under 28 U.S.C. 1346 and 1491. Consideration was given to including all nonappropriated fund activities. However, since the court's present jurisdiction over nonappropriated fund contracts is limited to certain post exchanges, and as there appears to be no problem with remedies relating to other nonappropriated fund activities, it was deemed unnecessary to in-

clude all or any additional nonappropriated fund activities within the scope of the bill.

*Id.* at 1343 (quoting S. Rep. No. 95-1118, at 18 (1978), reprinted in 1978 U.S.C.C.A.N. 5235, 5252). This legislative history led us to the "inescapable" conclusion "that Congress was aware of the non-appropriated funds doctrine and that it did not intend for the CDA to expand the court's jurisdiction to reach non-appropriated fund activities other than those specifically identified in the Tucker Act and incorporated by reference in the CDA." *Id.* at 1343-44.

The CDA's legislative history not only confirms that the NAFI doctrine applies to the CDA, it also reinforces our court's consistent view of the 1970 Act as "a narrow exemption from the [NAFI] doctrine for certain entities." *Id.* at 1339. The Senate report states that, as of 1978, the Court of Claims' "present jurisdiction . . . is *limited* to certain post exchanges." S. Rep. No. 95-1118, at 18 (emphasis added). This is unequivocal congressional recognition that the 1970 Act is a narrow exemption to, not a broad abandonment of, the NAFI doctrine. Moreover, the Senate report states that "as there appears to be no problem with remedies relating to other nonappropriated fund activities, it was deemed unnecessary to include all or any additional nonappropriated fund activities within the scope of the bill." *Id.* Again, this is unequivocal congressional recognition that NAFIs include more than military post exchanges and that the 1970 Act leaves these "additional" activities untouched.

The CDA's legislative history takes on greater importance when one considers that in the eight years between the 1970 Act and the CDA, the Court of Claims continued to expand the NAFI doctrine beyond military exchanges and did so relying on the same reasoning the majority

abandons today. For instance, in *McCloskey & Co. v. United States*, the Court of Claims held that the District of Columbia Armory Board was a NAFI and that the United States, therefore, was not subject to suit in the Court of Claims for breach of a contract entered into by the Board. 530 F.2d 374, 378 (Ct. Cl. 1976). In explaining the scope of the Tucker Act, the court, quoting *Kyer* extensively, reasoned that the Tucker Act is limited by 28 U.S.C. § 2517. Similarly, in *Novid Co. v. United States*, the Court of Claims found that the Army Corp of Engineers acted as a NAFI when it entered into a construction contract that was not to be paid through general appropriations. 535 F.2d 5, 6-8 (Ct. Cl. 1976). Given the Army Corp of Engineers' NAFI status, the court held that the United States could not be sued for breach of the construction contract. *Id.* Like *McCloskey*, the court again justified its decision with reference to *Kyer*'s reasoning. *Id.* Despite the continued growth of the NAFI doctrine and the Court of Claims' continued reliance on *Kyer*'s reasoning, Congress "deemed [it] unnecessary to include all or any additional nonappropriated fund activities within the scope of the [CDA]." S. Rep. No. 95-1118, at 18.

To summarize: contrary to the majority, the text of the Tucker Act and the legislative history surrounding the 1970 Act both confirm that the 1970 Act provided only a limited exception to the NAFI doctrine. Congress expressly revoked the NAFI doctrine for certain NAFIs (military and NASA exchanges), but it left all other NAFIs untouched. This interpretation is implicitly supported by the maxim of *expressio unius est exclusio alterius* and explicitly supported by the act's legislative history and text.

The rationale expounded by the majority is flawed because both Congress and the Supreme Court have en-

dorsed the NAFI doctrine. The doctrine serves to shield the public fisc from liability incurred by self-funded federal entities. Absent appropriations and specific statutory contractual authority, these federal entities are not endowed with the power to contractually bind the United States government. Abandoning the doctrine, as the majority has done today, opens a door to the Court of Federal Claims that both Congress and the Supreme Court have kept shut for the past six decades.

B.

In my view, under Supreme Court precedent and our precedent, the FDIC is clearly a NAFI because it receives no appropriated funds and is, moreover, a separate entity with independent authority to sue and be sued. Consequently, the FDIC is not subject to suit in the Court of Federal Claims in actions alleging breach of contract.

In *Hopkins*, the Supreme Court described a NAFI as "one which does not receive its monies by congressional appropriation." 427 U.S. at 125 n.2; *see also Standard Oil*, 316 U.S. at 485 (focusing on receipt of funds for operational purposes). Using this test as our starting point, our role is to determine whether Congress clearly intended to create an entity whose activities are to be independent of Treasury funds, particularly to the extent those activities give rise to the dispute lodged in the Court of Federal Claims. In making this determination, we must examine the governmental entity in question, the relevant activities of the entity, and the entity's enabling statute. We look primarily to the source of the entity's operational funds and its ability to sue and be sued as a separate entity. To the extent our prior cases have departed from the Supreme Court's standard for determining NAFI status, I believe those cases were incorrectly decided.

Turning to the case at hand, both parties rely upon and focus their arguments almost exclusively on the four-part test set forth in *AINS*, 365 F.3d at 1342-43. While *AINS* summarizes the development and application of the NAFI doctrine in this court, to the extent it has been read to set forth a new rigid test for NAFI status, such a reading sweeps too broadly. And while I conclude that the FDIC would be a NAFI under the *AINS* test, I caution against elevating *AINS* above our obligation to assess the jurisdictional question posed in light of the Supreme Court's directives in *Hopkins* and *Standard Oil*.

Examining the pertinent facts here, the FDIC is clearly a NAFI such that breach of contract actions against it are not cognizable in the Court of Federal Claims. As a starting point, the FDIC does not receive funding through congressional appropriation. There is no provision within the FDIC's enabling statute authorizing the appropriation of funds to the Deposit Insurance Fund ("DIF"), the fund the FDIC uses to perform its insurance and regulatory functions. Simply put, the FDIC is a self-funded entity.[5] The FDIC receives its funding from

---

[5] The majority attempts to establish that "the jurisdictional criterion is not whether the government entity is incorporated, but whether it is acting on authority of the United States." *Majority Op.* at 34. The cases the majority cites for support involve entities that clearly fall outside the NAFI doctrine not because they deal with a corporation, but because they are funded by government appropriation. *See Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536 (1946) (Reconstruction Finance Corporation); *National Cored Forgings v. United States*, 132 F.Supp. 454 (Ct. Cl. 1955) (same). The Supreme Court noted that "all of [the RFC's] money comes from the Government; its profits, if any, go to the Government; [and] its losses the Government must bear." *Cherry Cotton Mills*, 327 U.S. at 539. And *Crooks Terminal Warehouses v. United States*, 92 Ct. Cl. 401 (1941), cited

17

assessments on member banks, 12 U.S.C. § 1817(b), and the FDIC's enabling statute does not provide for the appropriation of general funds to defray the FDIC's expenses. In fact, Congress strictly limited the FDIC's ability to incur obligations, *see id.* § 1825(c)(5), and expected the FDIC to make special assessments upon member banks when it requires additional funds, *see id.* § 1817(b)(5).[6] Until the majority's opinion today, this court has found such assessment powers significant to the NAFI analysis. For instance, in *Furash* we held that the Federal Housing Finance Board ("Finance Board") was a NAFI because it was self-funded funded "through assessments against federal home loan banks, not from general fund revenues." 252 F.3d at 1341. The Finance Board's assessment powers were nearly identical to the FDIC's, including the ability to make emergency assessments in the event of an asset deficiency. *Compare* 12 U.S.C. § 1438(b)(2) (2006) (repealed 2008) *with* 12 U.S.C. § 1817(b)(5). Similarly, we found the Federal Reserve Board to be a NAFI in part because it was self-funded through assessments. *Denkler v. United States*, 782 F.2d 1003, 1005 (Fed. Cir. 1986).

Not only is the FDIC self-funded, it is statutorily required to separate its money from the general fund of the United States. First, all funds collected through assess-

in the same discussion, similarly involved a government corporation that was operated via appropriated funds. It is the funding source, not corporate structure, that is relevant to determining NAFI status.

[6] In the face of the most recent financial crisis, the FDIC exercised its emergency assessment powers and required its member institutions to pre-pay three years of premia to capitalize the DIF. *See* 74 Fed. Reg. 59056 (Nov. 17, 2009). Despite the significant strain the most recent financial crisis placed on the FDIC, the corporation did not request a loan from the Treasury.

ments must be placed in the DIF, not the general fund of the United States. *See* 12 U.S.C. § 1821(a)(4)(D). Second, Congress provided that the DIF's funds are not subject to apportionment. Pursuant to 12 U.S.C. § 1817(d), any "amounts received pursuant to [the FDIC's assessment power] and any other amounts received by the [FDIC] shall not be subject to apportionment for the purposes of chapter 15 of Title 31 or under any other authority." In *Furash*, we found that strikingly similar language in the Finance Board's enabling statute supported classifying the Finance Board as a NAFI. *See Furash*, 252 F.3d at 1341 (discussing 12 U.S.C. § 1422b(c)). Likewise, in *Core Concepts of Florida, Inc. v. United States*, we held that the Federal Prison Industries is a NAFI in part because its enabling statute made "clear that [Federal Prison Industries's] funds are to be kept distinct from general federal revenues." 327 F.3d 1331, 1336 (Fed. Cir. 2003).

These provisions make clear that the FDIC is a self-funded entity. As a self-funded entity, the FDIC lacks authority to obligate appropriated funds.[7] The United

---

[7] Moreover, in creating the FDIC, Congress specifically authorized the corporate body "to make contracts." Banking Act of 1933, Pub. L. No. 73-66, § 8, 48 Stat. 162, 172 (codified at 12 U.S.C. § 1819); *see also id.* at 176 ("The Corporation may make such . . . contracts as it may deem necessary in order to carry out the provisions of this section."). But unlike the Federal Savings and Loan Insurance Corporation, the FDIC's authorizing statute omits any statement that the FDIC is an instrumentality of the United States. *Compare* 12 U.S.C. § 1819(a) *with* 12 U.S.C. § 1725(c) (1988), *repealed by* FIRREA, Pub. L. No. 101-73, § 407, 103 Stat. 183, 363 (1989). And the FDIC was not given the statutory status of an "agency of the United States" until 1989, and even then only for the limited purpose of giving the federal district courts original jurisdiction over civil actions commenced by the FDIC.

19

States is thereby not bound by the FDIC's contractual commitments and cannot be sued in the Court of Federal Claims. *See Lion Raisins*, 416 F.3d at 1366.

C.

In passing, the majority suggests that the above precedent is inapplicable simply because the FDIC can borrow money from the Treasury. I, however, believe there is a fundamental distinction between allowing an entity to *borrow* funds from the Treasury and *appropriating* funds to that entity. In the former scenario, the entity retains its self-funded status, and it alone is responsible for its contractual commitments. In the latter scenario, the unfettered use of taxpayer dollars evidences congressional intent to share responsibilities for the entity's contractual commitments. This distinction is the essence of the NAFI doctrine.

Before demonstrating why borrowing is substantively different from receiving appropriations, it is fitting to examine the clear restrictions imposed upon the FDIC's borrowing authority. First, any funds borrowed can only be used "for insurance purposes." 12 U.S.C. § 1824(a). Second, while the FDIC may borrow from the Treasury to fund the DIF, such borrowing requires an agreed upon repayment schedule and a demonstration by the FDIC that its income from assessments will be sufficient for timely repayment of principal and interest. *Id.* § 1824(c). To ensure prompt repayment of any Treasury loan, Congress authorized the FDIC to levy "Emergency Special Assessments" on its member institutions if "necessary . . . to provide sufficient assessment income to repay amounts borrowed from the Secretary of the Treasury." *Id.* § 1817(b)(5). It is this assessment authority that led Sena-

---

*See* 103 Stat. at 216 (codified at 12 U.S.C. § 1819(b)(1)); 28 U.S.C. § 1345.

tor Michael Crapo during debate on the Helping Families Save Their Homes Act of 2009 to state that "[i]t is important to note that *this borrowing authority is not coming from taxpayer dollars.* The levies and the assessments that are made on the participants in the financial industry themselves, the depository institutions, are the source of the dollars that would cover this loan authority." 155 Cong. Rec. S5088, S5093 (May 5, 2009) (emphasis added). Finally, while the Secretary of the Treasury is "directed to loan" money to the FDIC, ultimately, the loan is purely discretionary and "subject to the approval of the Secretary of the Treasury." 12 U.S.C. § 1824(a)(1). Moreover, if the Secretary does decide to loan the FDIC money, the statute requires that the FDIC pay interest on the loan "not . . . less than an amount determined by the Secretary . . . taking into consideration current market yields.*" Id.* § 1824(a)(1). This requirement of interest payments is significant because it demonstrates both the FDIC's independent operation and Congress's intent to shield taxpayers from even indirect funding of the FDIC. Considerable weight must be given to the significant limits Congress placed on the FDIC's ability to borrow from the Treasury.[8]

Even if the FDIC's borrowing authority was largely unrestricted, borrowing is substantively different from receiving appropriations. Indeed, neither this court nor the Court of Federal Claims has found an instrumentality's ability to borrow funds precludes application of the

---

[8] The majority tries to import significance to the increase in the line of credit afforded the FDIC by Congress, from $3 billion to $500 billion. *Majority Op.* at 43. But the line of credit is a *borrowing* capacity granted the FDIC which must be repaid. *See* 12 U.S.C. § 1824(c). And the line of credit was not authorized until well-after after the creation of the FDIC.

21

NAFI doctrine. For example, in *AINS* we held that the U.S. Mint was a NAFI even though the Mint's enabling statute permits it to borrow money from the Treasury if needed. *See* 365 F.3d at 1344; 31 U.S.C. § 5136 (authorizing the Mint to borrow from the Treasury). The Court of Federal Claims has similarly distinguished between appropriated money and borrowed money. In *Aaron v. United States*, 51 Fed. Cl. 690, 692 (2002) *judgment vacated in part on other grounds Aaron v. United States*, 52 Fed. Cl. 20 (2002), the court had to determine whether the Federal Prison Industries, Inc. ("FPI" a/k/a "UNICOR") was a NAFI. The plaintiff argued that the FPI could not be a NAFI because it borrowed $20 million from the Treasury to purchase equipment. *See id.* The court rejected the plaintiff's argument and found the FPI to be a NAFI because "[a]n appropriation is very different from a loan . . . which must be repaid." *Id.* And, in *McCloskey & Co. v. United States*, the Court of Claims considered whether the District of Columbia Armory Board ("Armory Board") was a NAFI. 530 F.2d 374, 375 (Ct. Cl. 1976). The plaintiff entered into a contract with the Armory Board for the construction of RFK Stadium. *Id.* at 375-76. Congress authorized the Armory Board to issue bonds to pay for the construction of the stadium, but also provided that the Armory Board could borrow funds from the Treasury if the funds from bonds were insufficient. *See id.* at 376. Despite the ability to borrow funds, the court held that the Armory Board was a NAFI because Congress intended for the construction to be paid from non-appropriated funds. *See id.* at 377.

The distinction between borrowing and appropriating is made even clearer when one considers Congress's actions during the savings and loan crisis. In response to that crisis, Congress dissolved the Federal Savings and Loan Insurance Corporation ("FSLIC") by passing the

Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. 101-73, 103 Stat. 183. Prior to its dissolution, the FSLIC was to savings and loan institutions what the FDIC is today to commercial banks, i.e., it had "responsibility to insure thrift deposits and regulate all federally insured thrifts." *United States v. Winstar Corp.*, 518 U.S. 839, 844 (1996). The combination of high interest rates and inflation in the late 1970s and early 1980s caused hundreds of savings and loan institutions to fail. *See id.* at 845. Various legislative actions performed during the mid-1980s proved insufficient to ameliorate the crisis and "the multitude of already-failed savings and loans confronted FSLIC with deposit insurance liabilities that threatened to exhaust its insurance fund." *Id.* at 846. In response, Congress passed FIRREA, which abolished the FSLIC and transferred its insurance functions to the FDIC. *Id.* at 856.

Congress, however, did not transfer the FSLIC's assets and liabilities to the FDIC. Instead, it created a separate fund—the FSLIC Resolution Fund—to house all of the FSLIC's assets and liabilities. *See* 12 U.S.C. § 1821a. Congress then provided that "[a]ny judgment resulting from a proceeding to which the [FSLIC] was a party prior to its dissolution or which is initiated against the [FDIC] with respect to the [FSLIC] or with respect to the FSLIC Resolution Fund shall be limited to the assets of the FSLIC Resolution Fund." 12 U.S.C. § 1821a(d). In other words, all suits against the FSLIC or the FDIC (in its capacity as the FSLIC's successor) were to be paid from the FSLIC Resolution Fund. This is why "past payments on *Winstar* judgments are withdrawn from the FSLIC Resolution Fund." *See Home Sav. of Am., F.S.B. v. United States*, 69 Fed. Cl. 187, 191 (2005).

In addition to the FSLIC's existing assets, the FSLIC Resolution Fund is funded by (1) "[i]ncome earned on

assets of the FSLIC Resolution Fund," (2) "[l]iquidating dividends and payments made on claims received by the FSLIC Resolution Fund from receiverships," and (3) "[a]mounts borrowed by the Financing Corporation." 12 U.S.C. § 1821a(b). Importantly, however, the FSLIC Resolution Fund also receives complete Treasury backup. Specifically, Congress provided that if the FSLIC Resolution Fund's assets ever became "insufficient to satisfy the liabilities of the FSLIC Resolution Fund, the Secretary of the Treasury shall pay to the Fund such amounts as may be necessary, as determined by the [FDIC] and the Secretary, for FSLIC Resolution Fund purposes." *Id.* § 1821a(c). Treasury backing of the FSLIC Resolution Fund is mandatory, not discretionary. *Id.* ("[T]he Secretary of the Treasury *shall* pay to the Fund . . . ." (emphasis added)).

The differences between the FDIC's DIF and the FSLIC Resolution Fund are striking and underscore the distinction between a Congressional appropriation and a Congressional loan. Unlike loans authorized for the DIF, the FDIC has no obligation to repay any funds paid from the Treasury to the FSLIC Resolution Fund. *See id.* § 1824 (requiring repayment plan and demonstration that the FDIC has sufficient income to repay Treasury loan for DIF). Moreover, we have held that to the extent the FSLIC Resolution Fund is depleted, the "Treasury is required to disburse funds to the [FSLIC Resolution Fund]." *Landmark Land Co. v. United States*, 256 F.3d 1365, 1381 (Fed. Cir. 2001) (citing 12 U.S.C. § 1821a(c)); *see also id.* ("[E]ven if the FRF-FSLIC Fund were drained of all assets due to payment of damages for claims brought by the FDIC in the numerous *Winstar*-related cases, the government remains obligated to fully fund the FRF."). In contrast, there is no statutory requirement that the Secretary of the Treasury lend money to the

FDIC for the DIF.  *See* 12 U.S.C. § 1824(a)(1) (authorizing Treasury loan "subject to the approval of the Secretary of the Treasury").  The FSLIC Resolution Fund, therefore, illustrates how Congress appropriates funds to an entity, while the DIF illustrates how Congress makes available a loan to an otherwise self-supporting institution.  The distinction between the two is fundamental to the NAFI doctrine.  In the former scenario Congress subjects itself to contractual liability under the Tucker Act because appropriations are implicated, while in the latter scenario such contractual liability does not exist.  The majority fails to appreciate this legal distinction.

D.

The majority also finds support for its conclusion in congressional statements that "stress the full faith and credit of the United States in connection with the FDIC." *Majority Op.* at 39.  But these statements are directed to the FDIC's obligations to depositors, not its contract obligations, *see, e.g.*, Senate Concurrent Resolution 72 (128 Congressional Record S4530) (Mar. 17, 1982), and they do not have the force of a statutory obligation in any event.  The relevant inquiry is whether the FDIC's current enabling statute contains an express commitment of appropriated funds.  It does not.

The savings and loan crisis once again provides a lucid example.  Faced with the potential collapse of the entire savings and loan industry, Congress did not simply appropriate funds to the FSLIC.  Instead, it passed FIRREA, dissolved the FSLIC, and created the FSLIC Resolution Fund with an express Treasury backup.  It was politically expedient to provide the FSLIC with appropriated funds, but political expediency did not extirpate the need to amend FSLIC's enabling statute.  The same is true with the FDIC.  A statutory authoriza-

tion is essential to appropriate funds. *See AINS*, 365 F.3d at 1342 (holding that an entity is a NAFI if, *inter alia*, it is entitled to use appropriated funds only through a statutory amendment).

To the extent the majority gives congressional statements weight, it is relevant to note that Congress has consistently stated that the FDIC is a self-funded agency not dependent upon taxpayer funds. For example, during recent debate on the Continuing Extension Act of 2010, Senator Barbara Boxer aptly explained: "I think the American people have appreciated the FDIC over the years, because the FDIC was another way for taxpayers to be kept out of a problem, because it is an insurance fund. The banks are taxed and they put the money into the fund." 156 Cong. Rec. S2341, S2353 (Apr. 15, 2010). Similarly, Representative Brad Sherman stated "the FDIC collects an insurance premium from the banks so it would be the financial system, not the American taxpayer, paying the cost of taking care of this risk." 154 Cong. Rec. H10690, H10691 (Oct. 2, 2008). While these statements largely support my view of the FDIC, I cite them not for support, but to illustrate that the majority's reliance on select Congressional statements is erroneous.

If Congress wants to appropriate funds to the FDIC, it must do so through amending the FDIC's enabling statute, not through generalized statements of support. When Congress sought to "bail out" the savings and loan industry, it amended the FSLIC's enabling statute to create the FSLIC Resolution Fund and provide it express Treasury backup. Any comparable "bail out" of the FDIC would require a similar amendment to the FDIC's enabling statute because the FDIC is otherwise barred from using appropriated funds.

E.

A finding by this court that the FDIC is a NAFI would not close the courthouse doors on plaintiffs like Frank Slattery. The FDIC's enabling statute contains a "sue and be sued" provision. *See* 12 U.S.C. § 1819(a) ("[T]he Corporation shall become a body corporate and as such shall have power . . . [t]o sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal."). This provision is a waiver of the FDIC's sovereign immunity. *See Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538, 542-43 (9th Cir. 1987) ("The 'sue-and-be-sued' language of 12 U.S.C. § 1819 (Fourth) is a general waiver of sovereign immunity from claims brought against the FDIC."). Accordingly, suits such as Mr. Slattery's can be brought against the FDIC in district court. *See* Brief of the United States at 25, n.3 ("Slattery could have brought suit against the FDIC in United States district court pursuant to 12 U.S.C. § 1819(a)."). This is true, even if the plaintiff seeks money damages. *See Far W. Fed. Bank v. Office of Thrift Supervision*, 930 F.2d 883, 889 (Fed. Cir. 1991) (listing cases from eight circuits in which the FDIC's "sue and be sued" clause permitted suits for money damages in district court).

If Mr. Slattery had brought his suit in district court, any judgment he received against the FDIC would be paid from the DIF. *See Karstens Prods., Inc. v. F.D.I.C.*, No. 95-1392, 1995 WL 769019, at *4 (Fed. Cir. 1995) (unpublished) ("[I]n *Far West* [*Federal Bank v. Office of Thrift Supervision*, 930 F.2d 883, 890 (Fed. Cir. 1991)] we held that recovery in an action against the FDIC is limited to funds in the FDIC's possession and control and that such an action is not one against the United States."). Importantly, the FDIC could not borrow from the Treasury if Mr. Slattery's judgment exceeded the DIF's assets be-

cause the FDIC's borrowing authority is limited to its insurance functions. *See* 12 U.S.C. § 1824(a) ("The Corporation is authorized to borrow from the Treasury . . . such funds as . . . are from time to time required *for insurance purposes . . . .*" (emphasis added)). Instead, the FDIC would need to impose an emergency assessment on insured depository institutions to satisfy the judgment. *See Id.* §§ 1817(b)(5) (providing the FDIC with the authority to impose an emergency assessment "for any other purpose that the Corporation may deem necessary"); 1817(b)(2)(B)(ii) (providing that in determining the amount to assess banks, the Director should take into account any "case resolution expenses"). Accordingly, Mr. Slattery can bring his suit against the FDIC; he simply must do so in district court and is limited to those funds that the FDIC has acquired through its corporate activities or can acquire through an emergency assessment.

Likewise, a finding that the FDIC is a NAFI would not prevent depositors from bringing suits against the FDIC concerning their deposits. In the event of a bank failure, the FDIC must provide depositors with their insured deposits "as soon as possible." *Id.* § 1821(f)(1). Recognizing that there were likely to be disputes over deposits, Congress provided the FDIC with discretion to promulgate regulations for resolving deposit disputes. *See id.* § 1821(f)(3). When the FDIC resolves a dispute, its determination is a "final determination" subject to appeal in the "United States district court for the Federal judicial district where the principal place of business of the depository institution is located." 12 U.S.C. § 1821(f)(4). Therefore, if we correctly hold that the FDIC is a NAFI, we will not disrupt Congress's prescribed method for resolving depositor disputes because our holding would

only affect the Court of Federal Claims' jurisdiction, not the district court's.[9]

### F.

Because the majority rules that the FDIC is not a NAFI, the United States is now directly liable for the FDIC's contractual commitments. Mr. Slattery and future plaintiffs like him can now sue the United States in the Court of Federal Claims and will receive money damages directly from the Judgment Fund. *See McCarthy v. United States*, 670 F.2d 996, 1002 (Ct. Cl. 1982) ("[O]ur judgments, when awarded against the United States, are normally payable not from appropriations to maintain the agency that incurred the liability, but from appropriations made for the purpose of paying Court of Claims and other court judgments, now normally standing appropriations."). The FDIC, however, has no statutory obligation to reimburse the government for any

---

[9] At this juncture, I note that the majority reinstates—in fragments—the panel opinion reported at *Slattery v. United States*, 583 F.3d 800 (Fed. Cir. 2009). *Majority Op.* at 45. Although I believe it would be best to vacate the panel opinion and allow the *en banc* opinion to speak unambiguously for this court, to the extent the majority intends to reinstate Parts II and III of the panel opinion, I continue to dissent from those sections because we lack jurisdiction to decide the issues presented. Though not addressed in the majority *en banc* opinion, to the extent the majority reinstates Part IV, I continue to concur in the decision to reverse the judgment of the Court of Federal Claims dismissing Roth's claims, but only to the extent Roth asserts a constitutional takings claim against the Meritor receivership surplus. *See Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1368 (Fed. Cir. 2005) ("If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine.'" (quoting *United States v. Causby*, 328 U.S. 256, 267 (1946)).

damages paid out of the Judgment Fund. Accordingly, from this date forth, taxpayers, not the FDIC, shall bear the burden of the FDIC's contractual commitments.

The majority affords the FDIC complete insulation from liability. This insulation stands in stark contrast to Congress's requirement that those NAFIs specifically identified in the 1970 Act reimburse the government for any liability incurred by their breach of contract. *See* 31 U.S.C. § 1304(c)(2) ("The Exchange making the contract shall reimburse the Government for the amount paid by the Government."); *El-Sheikh*, 177 F.3d at 1325 (discussing the reimbursement obligation). The Army and Air Force Exchange Service must reimburse the government if a suit is brought against the United States for its actions, but the FDIC has no similar obligation. No policy reason exists to justify this disparate treatment. The most logical conclusion is that Congress never envisioned the United States being held liable for the FDIC's contractual commitments and therefore never saw a need to require reimbursement.

Startlingly, under the majority's analysis, taxpayers bear a heavier burden than they did when Congress bailed out the savings and loan industry in 1989. While the FSLIC Resolution Fund enjoys full Treasury backup, the backup is a "last resort," only to be called upon if the FSLIC's other assets are exhausted. *See* 12 U.S.C. § 1821a(c) & (d). Under the majority's holding, the FDIC need not exhaust any of its assets because the government is directly liable. In other words, the majority has by judicial fiat created a more direct bailout than the 1989 Congressional bailout of the savings and loan industry. When Congress bails out a federal corporation, it requires the corporation to expend all its assets first; when the Federal Circuit bails out a federal corporation, it asks

taxpayers to foot the entire bill. Because I do not support this alarming result, I dissent.