# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| CP of Bozeman, Inc. | ) ASBCA No. 58491 |
| | ) |
| Under Contract No. FA4626-12-H-0001 | ) |

APPEARANCE FOR THE APPELLANT:       Mr. Raul Luciani
                                    Owner

APPEARANCES FOR THE GOVERNMENT:     Lt Col James H. Kennedy III, USAF
                                      Air Force Chief Trial Attorney
                                    Anna F. Kurtz, Esq.
                                    Capt George Mathew, Esq.
                                    Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE CLARKE

This appeal involves a termination for cause of a Non-Appropriated Fund Instrumentality (NAFI) concession contract to operate two food concessions on Malmstrom Air Force Base (AFB), Montana. We deny in part and sustain in part.

## FINDINGS OF FACT

1. On 12 July 2011 the 341st Force Support Squadron issued a Request for Proposals for a NAFI contract to operate food concessions at the Community Activities Center (Grizzly Bend) and the Bowling Center (Aces High) on Malmstrom AFB (supp. R4, tab 1).

2. By email dated 20 July 2011, Mr. Luciani, owner of CP of Bozeman, Inc., submitted a list of questions to Ms. Redding, contract specialist, that included:

> - Please provide head count and income for the past twelve months[.]
> - Please provide expenses for the past twelve month[s].
> - Please provide estimate of assume inventory at bowling alley.
> - Is there any inventory to assume at the Grizzly?
> - When will the questions and answers be released?

- Please provide building seating capacity.

(Supp. R4, tab 5 at 3)  These questions were sent to the First Support Squadron to be answered (tr. 2/38, 71-72).  The 26 July 2011 response to Mr. Luciani took the form of a "Questions and Answers" (Q&A) document that included the following:

> Q: What is the head count and income for the past 12
>    months for the Bowling Center?
> A: Head count:  3,429 per month; income:  $246,872 (cost
>    of goods – 40%).
>
> Q: What are expenses for the past twelve months for the
>    Bowling Center?
> A: Supplies - $30,265; minor maintenance - $2,942;
>    coupons - $8,317; personnel - $86,834.
>
>    ....
>
> Q: What is the head count and income for the past 12
>    months for the CAC [Community Activities Center]?
> A: Head count:  750-1000 per month; income:  $146,747
>    (cost of goods – 40%).
>
> Q: What are the expenses for the past twelve months for
>    the CAC?
> A: Maintenance - $3,821; Coupons - $1,194; Supplies -
>    $12,013; Personnel Cost - $72,203.

(Supp. R4, tab 5 at 1)  Mr. Luciani thought the financial information provided on 26 July 2011 was "odd" in its format, but he did not ask follow-up questions about it (tr. 1/98).  He testified that he interpreted the information to show "$1,000 a month positive flow" but he didn't take into account the monthly stipends of $1,000 and $750.00 (tr. 1/110-11) (*see* finding 3).  Concerning the Q&A response (R4, tab 34 at 9), Mr. Luciani was asking for total gross sales information (tr. 1/150).  At the trial he testified that the answer "$246,000.00...cost of goods...40 percent" meant that the 40% came out of the $246,872 (tr. 1/151).[1]

3.  Contract No. FA4626-12-H-0001 (0001) was awarded to CP of Bozeman on 17 October 2011 to operate two concessions (R4, tab 1 at 2).  In consideration for the

---

[1] In his 14 October 2012 claim Mr. Luciani argued that the "cost of goods – 40%" was misleading and should have been listed with the other expenses (R4, tab 34 at 2).

contract, CP of Bozeman was to pay a monthly stipend of $1,000 for Grizzly Bend and $750 for Aces High and 7% of gross sales for each (R4, tab 1 at 1). The contract included the following relevant clauses:

2. Termination: Notwithstanding the clause titled "Termination for Convenience" of the General Provisions relative to termination of this Concessionaire contract, it is mutually agreed that this Concessionaire contract may be terminated in whole or in part by either party:

a. Immediately on written notice to the other party in the event of breach of this Concessionaire contract by the other party.
b. On 1-day notice in writing to the other party. No liability ensues to either party for terminations rendered pursuant to this subparagraph b.

8. TERMINATION FOR CONVENIENCE (JAN 2005) – The Contracting Officer, by written notice, may terminate this contract, in whole or in part, when it is in the best interest of the NAFI. If this contract is for supplies and is so terminated, the Contractor shall be compensated in accordance with FAR, Sub Parts 49.1 and 49.2 in effect on this contract's date. To the extent that this contract is for services and is so terminated, the NAFI shall be liable only for payment in accordance with the payment provisions of this contract for services rendered prior to the effective date of termination, providing there are no Contractor claims covering nonrecurring costs for capital investment. If there are any such Contractor claims, they shall be settled in accordance with FAR, Sub Parts 49.1 and 49.2.

10. TERMINATION FOR CAUSE (JAN 2005)
a.(1) The NAFI may, subject to paragraphs (c) and (d) below, by written notice of cause to the Contractor, terminate this contract in whole or in part if the Contractor fails to –

(i) Deliver supplies or perform the service within the time specified within this contract or any Extension;

(ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or

3

(iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below)

(2) The NAFI's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of notice from the Contracting Officer specifying the failure.

....

f. If after termination, it is determined that the cause by the Contractor was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for convenience of the NAFI.

(R4, tab 1 at 75, 79-80) The contract also included a Disputes clause that included in part:

a. Except as otherwise provided in this contract, any dispute or claim concerning this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall state his decision in writing and mail or otherwise furnish a copy of it to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Armed Services Board of Contract Appeals, and the decision of the Board shall be final and conclusive; provided that if no such appeal is filed, the decision of the Contracting Officer shall be final and conclusive.

(R4, tab 1 at 5) Mr. Weibel is the Director of Business Operations for the 341st Contracting Squadron, Malmstrom AFB (tr. 1/184). He explained that the contract was to run the snack bar at the Aces High Bowling Center, the food concession at the Grizzly Bend Club at the Community Activity Center (CAC) and do catering for the CAC (tr. 1/187-88). Mr. Weibel signed the 0001 contract (tr. 1/188; R4, tab 1 at 2).

4. During CP of Bozeman's performance of the contract the NAFI expressed concern over food service operations and sent numerous letters of concern and cure

4

notices (supp. R4, tab 51 at 2-4). At one point, Mr. Weibel offered to let Mr. Luciani close Aces High and just run Grizzly Bend (tr. 1/33). Mr. Luciani testified that he was "pretty much" consistently losing money on Aces High, but he didn't "stop" operating Aces High because he was able to increase prices and he hoped to fine tune the operation at Aces High to make money (tr. 1/90).

5. Mr. Weibel met with Mr. Luciani on 5 May 2012 to discuss the contract. On 6 November 2012 Mr. Weibel signed a memo documenting the meeting. (R4, tab 35)[2] Mr. Luciani believed that he should have been making more money based on the 26 July 2011 Q&A response to his request for financial information. Mr. Weibel went through the Q&A numbers and pointed out to Mr. Luciani that he had failed to reduce the Aces High and Grizzly Bend income by the 40% cost of goods. The result of accounting for the 40% was that Aces High would see a return of approximately $18,582.40[3] and the Grizzly Bend a loss of $1,182.80. Mr. Weibel recalled in the memo that Mr. Luciani said, "Oh, I didn't realize that." (Tr. 1/192-93; R4, tab 35 at 1)

6. On 9 May 2012, Mr. Luciani met with CO Wood, Mr. Weibel and Ms. Redding and expressed his concern that his concessions were not profitable (R4, tab 13 at 1). By letter dated 14 May 2012 to CO Wood, Mr. Luciani "follow[ed] up" the 9 May 2012 meeting again expressing his concerns over the fact that the Grizzly Bend and Aces High were not profitable. Mr. Luciani stated:

> During negotiations I asked for a financial statement for both the Aces High and the Grizzly Bend, these statements showed the Grizzly Bend was not making any profit however according to the figures provided the Aces High was supposed to bring in $118,508.00 net income which we were excited about because if we did not make money at the Grizzly as it was just being opened, then we could use the net from the Aces and use it to make up the difference at the Grizzly Bend.

(R4, tab 13 at 2) The only way to arrive at near the $118,508 figure for Aces High is to ignore the parenthetical "(cost of goods – 40%)"; here is the calculation: (Income - Expenses) $246,872 - ($30,265 + $2,942 + $8,317 + $86,834) = $118,514 (finding 2). Subtracting the 40% results in the following calculation: $246,872 x .60 = $148,123.20; $148,123.20 - ($30,265 + $2,942 + $8,317 + $86,834) = $19,765.20.

---

[2] Contracting Officer (CO) Wood asked Mr. Weibel to prepare the memo when she was getting ready to issue her final decision denying CP of Bozeman's claim (tr. 1/192).

[3] This amount was before accounting for the $750 stipend and 7% payments (R4, tab 1 at 1).

Further subtracting the $750 per month stipend ($9,000) and 7% gross sales payment would result in a loss. Mr. Luciani's 14 May 2012 letter states that Q&A financial data "showed the Grizzly Bend was not making any profit however according to the figures provided the Aces High was supposed to bring in $118,508.00 net income." If Mr. Luciani followed the same methodology he used for Aces High in calculating the figure for Grizzly Bend, i.e., not subtracting the "(cost of goods - 40%)" from the gross income, he would have found that Grizzly Bend likewise made a profit; here is the calculation: $146,747 – ($3,821 + $1,194 + $12,013 + $72,203) = $57,516. If, however, Mr. Luciani subtracted the 40% at Grizzly Bend he would get a loss; here is the calculation: $146,747 x .60 = $88,048.20; $88,048.20 – ($3,821 + $1,194 + $12,013 + $72,203) = -$1,182.80. Further subtracting the $1000 per month stipend ($12,000) and the 7% gross sales payment would increase the loss (finding 6). Mr. Luciani's 14 May 2012 letter indicating a profit at Aces High and loss at Grizzly Bend would seem to indicate that Mr. Luciani subtracted the 40% cost of goods for Grizzly Bend, but not Aces High. There is no explanation of this apparent anomaly anywhere in the record or in the briefs.

7. On 15 May 2012, Mr. Luciani requested a detailed monthly income statement for Aces High (tr. 1/38; app. supp. R4, tab 5 at 21). On 17 May 2012, the NAFI provided a monthly statement for fiscal year (FY 11) – October 2010 through September 2011 (tr. 1/38-39; app. supp. R4, tab 5 at 19, 22). The monthly income statement showed that for ten out of the twelve months the Aces High lost money with a net loss for the year of $20,736 (tr. 1/39; app. supp. R4, tab 5 at 22; R4, tab 13 at 11). The "cost-of-goods" was 46% and personnel costs of $105,119 whereas the Q&A financial data he was provided before award showed "cost-of-goods" as 40% and personnel costs of $86,834 (tr. 1/39-40; app. supp. R4, tab 4 at 12, tab 5 at 22). Mr. Luciani testified that he "would have never pursued this contract should I have seen this.... I would not have done this because this would have plain and simple, black and white put my family, the livelihood of my company at risk." (Tr. 1/41, 45) Mr. Luciani acknowledged that in July 2011 when he asked for financial information before award, not all of this FY 11 information existed (tr. 1/154).

8. Mr. Weibel testified that the data on the 26 July 2011 Q&A financial information was not the same data as on the spreadsheet showing data from FY 11 (October 2010 to September 2011). He testified that the Q&A information came from the FY 10 spreadsheet. (Tr. 1/196-97; R4, tab 34 at 9, 13) He also testified that the stipend and the 7% of gross proceeds would not be on the spreadsheet (tr. 1/199).

9. Mr. Douglas is a resource manager (finance), 341st Force Support Squadron, Malmstrom AFB (tr. 1/204). He is responsible for day-to-day operations of the accounting office (id.). He testified that the financial information provided on the 26 July 2011 Q&A document came from the Aces High operating statement for FY 10 (tr. 1/206-09; supp. R4, tab 60 at 9-11). The $246,872 and 40% are seen on page 9 of

the operating statement (tr. 1/207; supp. R4, tab 60 at 9). The $30,265, $2,942, and $86,834 are seen on page 10 of the operating statement (tr. 2/207-09; supp. R4, tab 60 at 10). The $8,317 is seen on page 11 of the operating statement (tr. 2/208; supp. R4, tab 60 at 11). The Q&A numbers given to Mr. Luciani did not include $6,012 in utilities on page 11 of the operating statement because CP of Bozeman would not have to pay utilities (tr. 2/209; supp. R4, tab 60 at 11). The spreadsheet given to Mr. Luciani on 17 May 2012 (finding 7) was generated from the FY 11 Aces High operating statement (tr. 1/209-10; supp. R4, tab 56).

10. Mr. Hamilton is the deputy for the 341st Force Support Squadron, Malmstrom AFB (tr. 2/6). He was involved in CP of Bozeman's contract from the "very beginning" (tr. 2/7). He testified that the NAFI gave Mr. Luciani the 2010 financial data in the Q&A document because it felt that the 2010 data was more comparable to CP of Bozeman's food operation than the 2011 data because in 2011 food service at the Grizzly Bend had been curtailed (tr. 2/9-12, 20).[4]

11. By letter dated 18 July 2012,[5] Mr. Luciani notified Ms. Redding as follows:

> I can't keep the Aces High open as it is losing money
> daily, I can't pay stipend nor rent for the Aces as I am no
> longer capable of running this facility. I will not be able to
> be open at the Aces High after Friday.

(App. supp. R4, tab 10 at 42, 44) Mr. Luciani testified that this was his one-day notice of termination pursuant to the termination clause in the contract (tr. 1/49, 59). He terminated the Aces High portion of the contract to allow him to operate the Grizzly Bend at a profit (tr. 1/50). Ms. Wood is a CO at the 341st Contracting Squadron, Malmstrom AFB (tr. 2/32). She was involved in CP of Bozeman's contract from the time the solicitation "hit the street" (*id.*). CO Wood agreed that she received a one-day notice, but also testified that she was confused by Mr. Luciani's 18 July 2012 letter stating he would be closing Aces High and "wasn't sure it was a termination" (tr. 2/55, 59).

12. As of Monday 23 July 2012 CP of Bozeman had closed Aces High and was removing their inventory (supp. R4, tab 49 at 3-4). On the same day CO Wood spoke

---

[4] In its post-hearing brief, the NAFI agrees that the Q&A financial information came from FY 2010 financial data (gov't br. at 8, ¶ 12).

[5] The "letter" does not have an addressee and it is unclear if the letter was actually delivered to the NAFI on Wednesday 18 July 2012 or by email on Thursday 19 July 2012 (app. supp. R4, tab 10 at 42, 44). However, NAFI documents indicate that it was delivered on Wednesday 18 July 2012 (supp. R4, tab 50 at 1, ¶ 4.a.) and that is what we find.

to Mr. Luciani and informed him that he could not unilaterally close the Aces High without approval of the CO and that if he did he would be in default (*id.* at 1).

13. By email dated 23 July 2012 to Mr. Luciani, Ms. Redding wrote:

> Raul,
> Please be advised that you cannot take an action such as closing the Aces High without approval from a Contracting Officer (i.e., Carolyn or Chuck).
> Otherwise, you will be in default of the terms and conditions of the contract.

(R4, tab 30 at 1) Mr. Weibel is "Chuck" and he was copied on the email. At the hearing he testified that now he did not agree with the email. (Tr. 1/201-02)

14. On 24 July 2012 a meeting was held within the NAFI to discuss termination of CP of Bozeman's contract. The decision was made to immediately terminate CP of Bozeman's contract for the following reasons:

> Basis for immediate termination:
>
> a. On 18 July 2012, CP of Bozeman informed 341 CONS that they could not continue to operate at the Aces High High [sic] (Bowling Center). Attachment 1
>
> b. On 23 July 12, Mrs. Lippert Wood spoke to Mr. Luciani and informed him that he could not make the decision unilaterally to close the Bowling Center. Mrs. Lippert Wood stated that if he chose to close without approval of a contracting officer, he would be in default of the contract. Attachment 2
>
> c. On 23 July 2012, Mr. Luciani began removing his food and beverage items from the Bowling Center. Attachment 3.

(Supp. R4, tab 50 at 1) At the hearing CO Wood agreed that there was nothing in the contract that obligated Mr. Luciani to obtain "approval" from a CO before exercising his right under the special provision providing for a one-day notice of termination and she agreed that her position to the contrary was wrong (tr. 2/67).

15. By letter dated 25 July 2012, CO Wood terminated Contract No. FA4626-12-H-0001 for cause (R4, tab 31). The stated reason was:

> You are notified that Concessionaire Contract,
> FA4626-12-H-0001, is terminated for cause immediately
> in accordance with contract Special Provision paragraph
> 2(b), Termination. This termination is a result of your
> breach of the Concessionaire Contract, by refusing to
> perform your contractual requirements at the Aces High.
> You have unilaterally modified the requirement by closing
> food services at the Aces High Bowling Center without
> approval from a contracting officer.

(R4, tab 31 at 1) She testified at the hearing that it was not a final decision (tr. 2/45). There was no appeal rights notice in the termination notice. When asked at the hearing why she did not put an appeal rights notice in the termination for cause letter, CO Wood testified she was not accustomed to putting such a notice in a termination since it wasn't a final decision. (*Id.*; tr. 2/68-69) CO Wood demanded payment of $13,405.33 for "amounts due" (R4, tab 31 at 2). At the hearing CO Wood agreed that in fact CP of Bozeman was not in breach of the contract (tr. 2/68). On 28 August 2012, CO Wood issued Modification No. 0003 unilaterally terminating the contract for cause "in coordination with Termination Notice 25 July 2012" (R4, tab 1 at 100). There was no notice of appeal rights in the modification.

16. On 14 October 2012 CP of Bozeman submitted a certified claim of $161,407.00 for losses under the 0001 contract (R4, tab 34). Mr. Luciani argued that he was mislead by the Q&A format answers to his questions:

> According to the information received 23 September, 2011
> (Attachment "A" page 5),[6] 1st question "WHAT IS THE
> HEAD COUNT AND INCOME FOR THE PAST 12
> MONTHS FOR THE BOWLING CENTER?" the total
> income for the Aces High was disclosed to be $246,872.00
> (COST OF GOODS – 40%) for the past 12 months, second
> question "WHAT ARE THE EXPENSES FOR THE PAST
> 12 MONTHS FOR THE BOWLING CENTER?" the total
> expense is the sum of the figures provided "SUPPLIES
> $30,285, MINOR MAINTENANCE $2,942.00,
> COUPONS $8,317.00, PERSONNEL $86,834.00"
> TOTAL = $128,378.00[.] Subtract from $246,872.00 it
> leaves a $118,494.00 net income or $9,874.50 per month
> net income.

---

[6] Attachment A, page 5, is the 26 July 2011 Q&A response to Mr. Luciani's questions
(R4, tab 34 at 9).

The first question was "WHAT IS THE HEAD COUNT AND INCOME FOR THE PAST 12 MONTHS", since the question specifically asked for head count and income (not expenses) it is assumed by me the answer is total income and headcount. If cost of goods – 40% is an expense it should have been addressed in the response to the second question "WHAT ARE THE EXPENSES FOR THE PAST 12 MONTHS FOR THE BOWLING CENTER[.]" If cost of goods implies an expense and it is 40% of the gross income, then this would equal $98,748.00 of additional expense that would need to be added to the expenses figure. If such is the case and if this information would have been answered as requested, this facility would have demonstrated it made $19,746.00 or $1,645.50 per month net income.

(*Id.* at 0271-72) Mr. Luciani made a similar argument for the Grizzly Bend and calculated a net loss of $1,182.00 (*id.* at 2). He also pointed out that when he asked for financial data for Aces High again he received a spreadsheet on 15 May 2012 that indicated Aces High had a loss for ten of the twelve months on the spreadsheet (*id.*). Mr. Luciani states that had he known of the true financial information showing the losses, he would "have ceased pursuit of this venture" (*id.* at 3). Appellant's claim also alleges that the government should have advised appellant that several new fast food stores were soon to open on base (R4, tab 34 at 0273). When CP of Bozeman started work there were four other food vendors on base. When the new BX opened that number went down to two, Popeye's and Subway (tr. 2/84). No detriment to appellant was proven.

17. By final decision dated 12 December 2012, CO Wood denied CP of Bozeman's claim (R4, tab 36). CO Wood took the position that CP of Bozeman misinterpreted the Q&A financial information, specifically failing to reduce the gross income by the 40% cost of goods. She denied that the NAFI mislead CP of Bozeman because the Q&A information conformed to a "standard Profit and Loss (P&L) Statement." She further advised that it could have avoided the vast majority of the damages it sought if it had invoked the one day notice termination provision of the contract, the very clause it did invoke (finding 11) which she deemed a breach on 25 July 2012 (finding 15). The decision included an appeal rights notice (app. supp. R4, tab 2 at 6).

18. By letter dated 28 December 2012, CP of Bozeman appealed CO Wood's 12 December 2012 final decision (app. supp. R4, tab 1). The appeal was docketed as ASBCA No. 58491 on 8 January 2013. The notice of appeal questioned the rationale

10

for denial of the monetary claim and also challenged the earlier issued termination for cause.

19. At the hearing the NAFI presented government exhibit A (ex. G-A) that presented the financial data that Mr. Luciani requested – the last twelve months of data for July 2010 to June 2011 (tr. 1/220-22). The data on ex. G-A corresponds to the data in the operating statements for FY 10 and FY 11 (tr. 1/222-23; supp. R4, tabs 56, 58). Ex. G-A shows a loss of $13,898 at the Aces High for the previous twelve months of financial data Mr. Luciani requested. However, the FY 11 data included breakfast provided in FY 11 that CP of Bozeman was not required to provide, but provided anyway, which may explain the differences between the years including the larger loss in FY 11 than FY 10 (tr. 1/213-16).

## DECISION

*Appellant's Affirmative Claim*

Appellant's claim requests $161,407[7] in losses it allegedly suffered as a result of the government allegedly providing it pre-bid financial information that did not comport with the information it had requested and that the government did so purposefully with the intent to deceive and confuse the potential bidders[8] (finding 16).[9]

It is appellant's position that had the information supplied been what it requested[10], it would have never bid on the solicitation (finding 7). We believe that the portion of this appeal involving appellant's affirmative claim is properly analyzed under the doctrine of superior knowledge. Under this doctrine the government has a duty to disclose critical information to potential contractors to prevent them from pursuing a ruinous course of action and failure to do so may be a breach of a contractual duty. *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1020-21

---

[7] On 15 May 2014, appellant moved to reopen the record and amend its claim upward to $5,082,133. The Board denied this motion on 23 June 2014 as premature since only entitlement was before the Board for decision.

[8] There is no evidence to support a finding of any intent to deceive or confuse bidders. The only evidence is that government personnel were attempting to provide appellant with more comparable information (finding 10).

[9] Appellant's claim also makes reference to two new fast food outlets opening after it commenced performance and alleges that the government should have advised it of the opening of these stores prior to bidding (R4, tab 34 at 273). As we found (finding 16), there is no factual basis for any allegation of any detriment to appellant from this scenario, and we do not discuss it further.

[10] Of course, not all the information even existed at the time of appellant's question (finding 7).

(Fed. Cir. 2003). The elements of proof of such a breach are: (1) the contractor undertook performance without the vital knowledge; (2) the government was aware that the contractor did not have the knowledge and had no reason to seek it; (3) the information that was supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. *GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991), *cert denied*, 502 U.S. 1971 (1992). We have held that the failure of the government to provide bidders on a NAFI solicitation with current monthly sales and income reports, rather than older data, when such information was requested and relevant, can amount to failure to disclose superior knowledge. *Ogden-HCI Services*, ASBCA No. 32169, 93-3 BCA ¶ 26,141 at 129,960, *aff'd on recon.*, 94-1 BCA ¶ 26,489. We conclude that appellant's evidence fails to satisfy the tests set forth in *McDonnell Douglas*.

In this appeal, prior to bidding, appellant requested current financial information regarding performance of the prior contract and received accurate financial information but for an earlier undisclosed period (findings, 2, 7-10). Appellant thought the data was "odd" but made no further inquiry. Further, it made serious misinterpretations and mistakes with regard to the data supplied by the government. (Findings 2, 5)

While it is clear that the government did not provide appellant with data for the time period requested, we cannot hold that this was what induced appellant to bid. Appellant did not properly treat the 40% cost of goods figure (findings 5, 6), nor did it properly take into account the monthly stipend or the 7% gross sales payments that it was to be responsible for paying to the government (findings 2-3, 5). Additionally, appellant apparently treated the figures inconsistently (findings 5, 6). To the extent that any of the information was ambiguous, such ambiguity was patent, especially since appellant apparently treated the figures differently (finding 6) for Aces High and Grizzly Bend. *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

Moreover, a comparison of the data provided by the government (findings 2, 7-10) to the data appellant requested (finding 19), shows that once the 7% gross sales payments and the monthly stipend payments and the 40% cost of goods figure are taken into account, both of the locations would have shown losses (findings 6, 7, 19). It was appellant's failure to properly use the data provided by the government and in the solicitation that deprived it of this loss information. The root cause of Mr. Luciani's trouble here is not the NAFI's erroneous financial data, but Mr. Luciani's failure to inquire of the NAFI what the parenthetical meant and as a result his failure to subtract the 40% from the Aces High gross revenue and failure to account for the monthly payments CP of Bozeman was obligated to make to the NAFI. Under these circumstances we conclude that the NAFI's failure to advise appellant that the information supplied in response to appellant's questions was from a different time

12

period than that requested, did not act to appellant's detriment. It was Mr. Luciani's erroneous use of much of the available information that was the source of its difficulties. We also cannot ignore the fact that Mr. Luciani appears to have subtracted the 40% from the Grizzly Bend gross income to arrive at the loss referred to in his 14 May 2012 letter – the "anomaly" discussed above (finding 6). We deny CP of Bozeman's claim.

*The Termination for Cause*

The NAFI argues that we have no jurisdiction over the termination because Mr. Luciani failed to file an appeal challenging the termination for cause (gov't br. at 34). The government asserts that our jurisdiction over this NAFI contract dispute derives from the Disputes clause in the contract and not from the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109 (gov't br. at 35). Historically this assertion has been correct although *Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011), raises some questions as to the continuing validity of that doctrine. *See Harry Richardson*, ASBCA No. 57582, 12-1 BCA ¶ 34,902. We need not reach it in this case as our result would be the same under the Disputes clause or the CDA.

It was the NAFI's obligation to issue the termination for cause in the form of a final decision with notice of appeal rights given to the contractor in order to start the 30-day appeal period running and it totally failed to do so. *Pathman Construction Co. v. United States*, 817 F.2d 1573, 1578 (Fed. Cir. 1987); *see also Decker & Co. v. West*, 76 F.3d 1573, 1580 (Fed. Cir. 1996) (explaining that *Pathman* is limited to situations where there is a total absence of notice of appeal rights, but that where the notice is merely defective, a contractor must show detrimental reliance on the defect to preclude the start of the running of the time for appeal). Under these circumstances it cannot be said that CP of Bozeman was required to appeal the termination prior to its 28 December 2012 notice of appeal.

Here, appellant challenged the termination for cause in its notice of appeal of the contracting officer's denial of its 14 October 2012 claim for losses under the contract. Such challenge is not untimely.

The stated basis for the termination was, "This termination is a result of your breach of the Concessionaire Contract, by refusing to perform your contractual requirements at the Aces High. You have unilaterally modified the requirement by closing food services at the Aces High Bowling Center without approval from a contracting officer." (Finding 15) This basis was wrong under the contract. At the hearing CO Wood agreed that CO approval was not required for CP of Bozeman to exercise its unilateral right to terminate Aces High with a one-day notice as it did on 18 July 2012 and that CP of Bozeman was not in breach of contract (findings 11,

13-15). We sustain this aspect of the appeal and convert the termination for cause into a termination for convenience (*see* finding 3).

## CONCLUSION

We deny the claim for misrepresentation and sustain the appeal of the termination for cause and convert it to a termination for convenience.

Dated: 8 July 2015

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58491, Appeal of CP of Bozeman, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

14